No. 74,678

STEPHEN AMOS KOSER, *Appellee*, v. THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, *Appellant*.

928 P.2d 85

Opinion filed December 6, 1996.

*Jeffrey P. Ray*, of Lathrop & Gage, L.C., of Kansas City, Missouri, argued the cause, and *Patrick J. Gregory*, of Overland Park, was with him on the briefs for appellant.

*David L. Blunt*, of Blunt and Associates, Ltd., of Edwardsville, Illinois, argued the cause, and *George E. Mallon*, of George E. Mallon, P.A., of Kansas City, was with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is an action brought by Stephen A. Koser, a railroad employee, against the Atchison, Topeka and Santa Fe Railway Company (ATSF) under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 *et seq.* (1994). ATSF conceded liability. The question of the amount of damages was submitted to a jury,

which awarded Koser $1,137,860 for his personal injuries. ATSF appeals from the district court's refusal to enter a judgment notwithstanding the verdict or to vacate the judgment for a new trial. This court transferred the case from the Court of Appeals on July 22, 1996.

On October 6, 1990, the four locomotives of the train Koser was on were being fueled in Argentine, Kansas, when another train, without warning, ran into the rear of Koser's train. At the time, Koser was 44 years old and employed by ATSF as a locomotive engineer. The impact threw him forward over the engineer's seat from where he was standing near the rear door of the locomotive.

Koser testified that although he immediately felt pain in his ribs following the accident, he completed his scheduled return trip to Fort Madison, Iowa. Upon arriving in Fort Madison, Koser was taken to a hospital emergency room. There he was x-rayed, put into a cervical collar, given some medication, and sent home.

Several days later when Koser saw Dr. Cook, the ATSF company physician who acted as Koser's regular doctor, his neck had gotten progressively worse and he was experiencing some numbness in his arm. Dr. Cook recommended therapy and medication, which at that time relieved the symptoms somewhat, and referred Koser to Dr. Paul, an orthopedic specialist. Dr. Paul sent Koser to a work-hardening program and referred him to Dr. Sharp. Koser participated in the program for approximately 6 to 8 weeks. When he completed the program in April 1991, Koser continued to have numbness and pain in his arm, but he was feeling better.

On May 9, 1991, Koser was examined by Dr. Paul for the purpose of obtaining a return-to-work release. Although the doctor released him for work on May 13, Koser was not allowed to work until he had passed a rules examination and a company physical examination.

On May 13 and 14, 1991, Doug Shaw, a private investigator, conducted surveillance of Koser for ATSF. He watched Koser from noon to 6 p.m. on May 13 and from 6 a.m. to 6 p.m. on May 14. Shaw testified that on May 14, he obtained approximately 50 continuous, unedited minutes of videotape and several photographs of Koser mowing his grass.

When Koser returned to work after passing the rules examination and the company physical, he found that the train rides bothered him, but he continued to work. At trial, he testified that, due to the "constant vibration, slack action and stuff like that," work just wore him out.

In late winter of 1992, Koser, who previously had been a ski instructor, and his wife took their children on a skiing trip to Vail, Colorado. After a few runs, Koser quit skiing and watched the others. He testified: "My neck got real sore and my arm got real weak and ached and [was] quite painful." After returning home, he underwent surgery by Dr. Sharp. The pain remained in his arm, but he felt immediate relief in his neck, which lasted approximately 3 to 4 months after surgery. After returning to work, his arm got worse and the neck pain resumed. Dr. Sharp referred him to a pain clinic.

Koser testified that in the spring of 1993, when he was working, he was "always tired and just exhausted, from pain I think, and just hurting all over." In June 1993, Dr. Paul arranged for Koser to go to the Mayo Clinic, where there were people with some expertise in thoracic outlet syndrome. He saw 10-12 doctors, including Drs. Hallett and Schutt, during his 4-day stay.

In December 1993, he had surgery as recommended by Dr. Hallett. Koser testified that following the surgery, "[m]y neck felt so much better but my arm was still bothering me."

He returned to work in February 1994 with some doctor-imposed restrictions on the length of continuous train rides and the amount of weight he could lift. ATSF restricted him to yard work, but he worked long hours. Koser then felt exhausted all the time and his neck, arm, and chest hurt.

ATSF required Koser to be examined by Dr. Abrams in Kansas City in late May 1994. Koser spent approximately 2 ½ hours with Dr. Abrams, who concluded that Koser should not be working as a railroad engineer. Dr. Hallett referred Koser to Dr. Schutt, who advised him not to return to railroad work. In June 1994, Koser presented Dr. Schutt's release to ATSF. ATSF required him to be examined by Dr. Cook, who concurred in Dr. Schutt's evaluation.

Dr. Abrams testified at trial on behalf of ATSF. He had not yet seen the surveillance videotape when he examined Koser in May 1994; he received it in February 1995 and viewed it before giving his trial testimony on March 2, 1995. He described the videotape as depicting Koser mowing his lawn and testified that it "[l]ooked like he was using a self-propelled mower. Stopping occasionally to either empty the bag or to—taking the mower up or down a curb." The activity depicted in the videotape, according to Dr. Abrams,

"was at somewhat of a variance of what my understanding was of what would disturb Mr. Koser. My understanding was that any vibration that was transmitted to his right arm or chest would disturb him, that he would be able to exert a force of, let's say five pounds or more without marked discomfort. And while this is a self-propelled mower, it's certain that there is vibrating and it has to be stopped, started and pushed.

"I think there were segments where it's pushed up a hill, up and down a curb, et cetera, et cetera, et cetera."

It was Dr. Abrams' opinion, "taking the surveillance tape and making an assumption that the patient can do what he was doing there," that Koser could operate a railroad engine. Based on the videotape which had been made in May 1991, Dr. Abrams concluded in February 1995 that the restrictions he placed on Koser after examining him in May 1994 could be removed.

In his deposition, Koser was asked about mowing his lawn. He testified: " 'I hire a kid or I go—now, this is in '94, I have gone out and mowed before, you know, but it hurts and I haven't done anything since the last surgery, which was in April, after the surgery.' "

John Ward provided expert testimony on economics for Koser. He testified about various calculations he had made with respect to Koser's economic losses due to the injuries sustained when Koser's train was rear-ended on October 6, 1990. Ward testified that the earnings he projected for Koser were net rather than gross in that the amounts Koser would have paid in taxes—federal and state—had been subtracted. In addition, the earnings figures used by Ward represent present cash value. Ward explained:

"I'm not looking at what a person's earnings is five years from now, I don't want to give him that, I want to give him a sum he can invest for five years which would

equal what he could have earned five years from now. So the loss I've calculated is significantly less than what the actual loss is. It's the present value of that loss."

Ward prepared an exhibit showing what Koser's losses would be if he were unable to work and what they would be if he were able to work at something other than railroad work and earn $10 per hour plus benefits. It was admitted into evidence and used as the basis for much of Ward's direct testimony.

Ward's projected economic loss if Koser were unable to work was $1,076,311. He began with a gross earnings loss of $1,067,503. He added the present value of health and dental insurance at the rate paid by the railroad. He weighed the possibility of unemployment against the railroad's contribution for unemployment insurance. He subtracted for federal and state taxes. He concluded that Koser's retirement contributions balanced pension benefits, thus neither reducing nor increasing the gross earnings loss. He added for the loss of household services which Koser cannot perform.

Ward's projected economic loss if Koser were able to earn $10 per hour was $759,438. He figured wages of $298,913. He added benefits at $43,073. He subtracted taxes of $25,114. He then subtracted the total from the loss calculated for Koser if he were unable to work:

| | |
|---|---|
| $ 298,913 | $1,076,311 |
| + 43,073 | −316,872 |
| − 25,114 | $ 759,438 |
| $ 316,872 | |

At the close of the trial, 11 of the 12 jurors agreed on this assessment of damages:

| | |
|---|---|
| Noneconomic loss to date | $ 54,000.00 |
| Future noneconomic loss | 185,000.00 |
| Economic loss to date | 92,344.00 |
| Future economic loss | 806,516.00 |
| TOTAL | $1,137,860.00 |

The award for future economic loss lies within the range projected by Ward.

Among the grounds stated in ATSF's post-trial motion for new trial and/or remittitur and/or judgment notwithstanding the verdict were the district court's excluding the surveillance videotape from evidence and refusing to give the railroad's requested instruction on reducing future damages to present cash value. The district court denied the motion. ATSF appealed.

We first consider the trial court's failure to give ATSF's requested instruction on the present value of future economic damages. ATSF's argument on this issue may fairly be summarized as follows: (1) ATSF requested a federally approved instruction on present worth of future economic loss, (2) the trial court refused to give it, and (3) the United States Supreme Court has held that a jury must be instructed on present value in FELA cases; therefore, (4) the judgment must be reversed. ATSF contends that the standard to be applied by this court on appeal is whether, viewed in a light most favorable to ATSF, the evidence supports the submission of its proposed instruction. We do not agree. Given ATSF's statement of the issue and the substance of its argument, the appropriate standards to be applied in this appellate review involve civil jury instructions and, in particular, the trial court's refusing to give a requested instruction. In this regard, this court adheres to the following standards:

"If the jury instructions, read as a whole, fairly instruct the jury on the law governing the case, are substantially correct, and the jury could not reasonably be misled by them, the instructions will be approved on appeal. *Guillan v. Watts*, 249 Kan. 606, 617, 822 P.2d 582 (1991); *Leiker v. Gafford*, 245 Kan. 325, Syl. ¶ 1, 778 P.2d 823 (1989)." *In re Application of City of Great Bend for Appointment of Appraisers*, 254 Kan. 699, 713, 869 P.2d 587 (1994).

"[R]efusing to give an instruction is not error when its substance is adequately covered in other instructions. A court should not by its instructions unduly emphasize one aspect of a case. *Schallenberger v. Rudd*, 244 Kan. 230, 232, 767 P.2d 841 (1989)." *Guillan v. Watts*, 249 Kan. 606, 617, 822 P.2d 582 (1991).

"Errors regarding jury instructions will not demand reversal unless they result in prejudice to the appealing party." *Noel v. Pizza Management, Inc.*, 258 Kan. 3, 12, 899 P.2d 1013 (1995) (quoting *Cerretti v. Flint Hills Rural Electric Co-op Ass'n*, 251 Kan. 347, 353, 837 P.2d 330 [1992]).

"An instruction is clearly erroneous when the reviewing court reaches a firm conviction that, if the trial error had not occurred, there was a real possibility that

the jury would have returned a different verdict." *Noon v. Smith*, 16 Kan. App. 2d 818, Syl. ¶ 2, 829 P.2d 922 (1992).

In the present case, ATSF requested that the jury be given a particular instruction it had prepared on its theory that an award of future medical expense and/or loss of future earnings must be reduced by the jury to present cash value. Instead, the trial court added information about present value to Kansas Pattern Instructions on personal injury damages. ATSF notes that under FELA, a " 'party is entitled to an instruction based on his theory of the case if there is record evidence to support it.' " *Kauzlarich v. Santa Fe Ry. Co.*, 910 S.W.2d 254, 258 (Mo. 1995) (quoting *Trejo v. Denver & R.G.W.R. Co.*, 568 F.2d 181, 184 [10th Cir. 1977]). In *Kauzlarich*, the issue appealed was whether Santa Fe was entitled to a separate instruction on mitigation of damages. The trial court refused to give a mitigation of damages instruction. On appeal, the Missouri Supreme Court found that Santa Fe was entitled to such an instruction. The court relied on the Tenth Circuit's decision in *Trejo*, stating:

"In *Trejo*, trial testimony indicated that the plaintiff's only efforts to secure alternative employment were to ask the defendant employer, as well as his union, for light work. Because his request of the defendant was denied, the trial court refused to submit to the jury the defendant's mitigation instruction. *Trejo*, 568 F.2d at 184. On appeal, the plaintiff argued that he was unemployable as a matter of law; therefore, the trial court was correct in not instructing the jury on his duty to mitigate. *Id.* The United States Court of Appeals, Tenth Circuit, stating the basic rule that '[a] party is entitled to an instruction based on his theory of the case if there is record evidence to support it,' held that the refusal to give a requested mitigation of damage instruction was error. *Id.* By producing evidence regarding the plaintiff's lack of effort to secure work after his injury, the defendant had sufficiently raised the issue of mitigation, a question of fact properly before the jury. As a matter of federal substantive law, therefore, the defendant was entitled to a separate instruction on the issue. *Id; Accord Wilson v. Consolidated Rail Corp.*, 875 S.W.2d 178, 182 (Mo. App. 1994) ('FELA defendant is entitled to an instruction on the mitigation of damages if there is evidence in the record to support a finding that the plaintiff failed to mitigate his damages.')." 910 S.W.2d at 258.

Here, the first inquiry must be whether ATSF's "theory" about present cash value is correct as a matter of law. If so, then the question of evidentiary support for the theory might be taken into

consideration. The heart of this inquiry, however, remains whether the trial court's refusal to give the particular instruction requested by ATSF on present value prejudiced the railroad.

In the present case, the only portion of the damages award which is at issue is the future economic loss, which was calculated by the jury to be $806,516. ATSF does not contend that the jury's award for future *non*economic loss is required to be reduced to present value.

ATSF requested the following instruction:

"If you should find that the plaintiff is entitled to a verdict, and further find that the evidence in the case establishes either: (1) a future medical expense, or (2) a loss of future earnings, then it becomes your duty to ascertain the present cash value of such future damage, since the award of future damages necessarily requires that payment be made now [for] a loss that will not actually be sustained until some future date.

"Under these circumstances, the result is that the plaintiff will in effect be reimbursed in advance of the loss, and so will have the use of money which he would not have received until some future date, but for the verdict.

"In order to make a reasonable adjustment for the present use of money representing a lump-sum payment of anticipated future loss, the law requires that the jury discount, or reduce to its present worth, the amount of the anticipated future loss by taking (1) the interest rate or return which the plaintiff could reasonably be expected to receive on an investment of the lump-sum payment, together with (2) the period of time over which the future loss is reasonably certain to be sustained; and then deduct from the total amount of anticipated future loss whatever that amount would be reasonably certain to earn or return, if invested at such rate of interest over such future period of time; and include in the verdict this reduced amount after also taking into account inflation.

"A chart is attached to these instructions which will guide you in this regard."

The district court refused to give the instruction requested by ATSF. On appeal, ATSF "contends that the trial court erred in not giving the jury [its] proffered instruction on present value."

The following instructions for calculating Koser's damages were given:

"You shall determine only the amount of damages sustained by the plaintiff, Stephen Koser, as a direct result of the accident on October 6, 1990. You should allow him such amount of money as will reasonably compensate him for his injuries and losses resulting from the occurrence in question, including any of the following shown by the evidence:

"a. Pain, suffering, disabilities, and any accompanying mental anguish suffered by plaintiff to date and those plaintiff is reasonably expected to experience in the future. This type of damage is called non-economic loss.

"b. Loss of time or income to date by reason of his disabilities and that which he is reasonably expected to lose in the future reduced to present value.

"c. Aggravation of any pre-existing ailment or condition.

"In determining the amount of damages, you should consider plaintiff's age, condition of health before and after, and the nature, extent and duration of the injuries. For such items as pain, suffering, disability and mental anguish, there is no unit value and no mathematical formula the Court can give you. You should award such sum as will fairly and adequately compensate plaintiff. The amount to be awarded rests within your sound discretion." Instruction No. 11.

"In interpreting and applying the last instruction, there are two types of damages that you may allow:

"1. Noneconomic loss. This type of damage includes (a) pain and suffering and (b) disability and any accompanying mental anguish suffered by plaintiff to date and that which plaintiff is reasonably expected to experience in the future.

"2. Economic loss. This type of damage includes loss of time or income to date by reason of plaintiff's disabilities and that which plaintiff is reasonably expected to lose in the future reduced to present value." Instruction No. 12.

"In calculating damages for loss of earnings of the plaintiff, you should consider net earnings after income taxes rather than gross earnings.

"You are also instructed that the amount of your award in this case will not be subject to income taxes." Instruction No. 14.

In denying ATSF's post-trial motion, the district court judge stated that he refused to give the requested instruction because he believed it was superfluous. The jury had been instructed that an award for future economic loss must reflect present worth. ATSF conceded that the future economic damage figures computed by John Ward already had been reduced to present cash value. No other witnesses testified about future damages. Thus, the jury heard no future economic loss figures which had not been reduced to present worth. ATSF's counsel, however, argued that the court's instruction was inadequate and that the requested instruction was necessary because "the determination of what a present value is, which is required in FELA cases, is to be made by the trier of fact" rather than an economist. In this regard, ATSF seems to be contending that federal law requires the trial court, if requested, to allow the jury to determine the discount rate as well as to apply it.

ATSF relies on *St. Louis Southwestern R. Co. v. Dickerson*, 470 U.S. 409, 84 L. Ed. 2d 303, 105 S. Ct. 1347 (1985), in which a Missouri trial court's refusal to instruct the jury in a FELA case "that its award to the plaintiff should reflect the present value of any future losses the plaintiff should sustain" was reversed. The only instruction given by the Missouri trial court on damages stated:

" 'If you find the issues in favor of plaintiff, then you must award plaintiff such sum as you believe will fairly and justly compensate plaintiff for any damages you believe he sustained and is reasonably certain to sustain in the future as a result of the fall on December 11, 1978, mentioned in the evidence. Any award you make is not subject to income tax.' " 470 U.S. at 410.

The Missouri Court of Appeals affirmed on the ground that a present-value instruction was inappropriate as a matter of Missouri law. The United States Supreme Court observed that it is settled that the substantive law governing FELA cases is federal rather than state and that "jury instructions concerning the measure of damages in an FELA action is an issue of 'substance' determined by federal law." 470 U.S. at 411. The federal rule since 1916 has been that a FELA defendant which requests it "is entitled to have the jury instructed that 'when future payments or other pecuniary benefits are to be anticipated, the verdict should be made up on the basis of their present value only.' *Chesapeake & Ohio R. Co. v. Kelly*, 241 U.S. 485, 491 (1916)." 470 U.S. at 411-12. Thus, "an *utter failure* to instruct the jury that present value is the proper measure of a damages award is error." (Emphasis added.) 470 U.S. at 412. "[N]o single method for determining present value," however, "is mandated by federal law." 470 U.S. at 412 (citing *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 536-37, 76 L. Ed. 2d 768, 103 S. Ct. 2541 [1983]). *Jones & Laughlin* was also cited for the proposition "that the method of calculating present value [of future loss] should take into account inflation and other sources of wage increases as well as the rate of interest." 470 U.S. at 412. Thus, in FELA cases tried in state courts, a jury presented with evidence of future economic loss must be instructed that its proper measure is its present worth, but the form and content of the instruction are not mandated by any federal rule. In *Jones & Laugh-*

*lin*, the Supreme Court used the phrase "delusive exactness" in connection with this federal rule. 462 U.S. at 552. The Court stated: "It is perfectly obvious that the most detailed inquiry can at best produce an approximate result. And one cannot ignore the fact that in many instances the award for impaired earning capacity may be overshadowed by a highly impressionistic award for pain and suffering." 462 U.S. at 552.

In this case, the computations reducing future economic damages to present cash value were performed by John Ward, and he told the jury that the figures which he used in his testimony and accompanying exhibit already had been reduced where appropriate. ATSF argues that this approach is unacceptable because it annuls the prerogative of the jury to reduce an award of future damages to present value. Thus, the argument continues, the district court's rationale that the requested instruction would serve no useful purpose because Ward's figures already had been reduced to present value fails to address the core question of whether the railroad is entitled to have the jury determine the discount rate.

ATSF cites *Oliveri v. Delta S.S. Lines, Inc.*, 849 F.2d 742 (2d Cir. 1988), as exemplifying the cases in which the district court's rationale was rejected. It is an action under the Jones Act, which ATSF terms the "longshoremen's equivalent of the FELA," and to which principles developed under FELA apply. See *Kernan v. American Dredging Co.*, 355 U.S. 426, 439, 2 L. Ed. 2d 382, 78 S. Ct. 394 (1958). Delta conceded liability; the question of damages was tried to a jury. Despite discussing the discounting issue at several pre-charge conferences, "[n]either side clearly articulated the precise method by which discounting should be accomplished." 849 F.2d at 744. Oliveri's economics expert testified that his figures for lost future earnings included an upward adjustment for inflation by approximately 4.1% per year and a downward adjustment to present value using a discount factor of 6.5%, which he termed "an historical average of low-risk interest rates." 849 F.2d at 744. The trial court judge "concluded that the parties had stipulated that he would do the discounting and that he would do so simply by reducing the future components of the jury's award by 2%, *i.e.*, subtracting 2% of the amount of such components and including

the remaining 98% in the judgment." 849 F 2d at 744. The jurors were "instructed that they should not be concerned with discounting to present value but that they should be aware that 'any future figures you give' would be reduced by 2%." 849 F.2d at 744. The appellate court determined that the trial court judge was incorrect in believing that the parties agreed to his method. Moreover, the present value amount calculated by the trial court judge was significantly incorrect due to the grossly oversimplified approach he mistakenly believed the parties had authorized him to use. As discounted by the trial court judge, the future earnings award was $235,200. He simply subtracted 2% of $240,000 from $240,000. The same 2% inflation-adjusted rate applied correctly to each year's component rather than the total estimated future earnings yields, according to the Second Circuit court, $204,595.90. The appellate court's solution was to remand the matter "for a new trial only to determine an inflation-adjusted discount rate, unless the plaintiff accepts a remittitur" in the amount of the difference between $235,200 and $204,595.90 (plus another amount not pertinent to this discussion). 849 F.2d at 752. If Oliveri did not accept the condition, the retrial jury was to determine the inflation-adjusted discount rate to be applied to $240,000. 849 F.2d at 749.

In an effort to draw a parallel with the present case, ATSF represents that the trial court in *Oliveri* refused to instruct on present value and that the appellate court rejected the plaintiff's assertion that an instruction on reducing future economic losses to present worth was unnecessary.

ATSF somewhat misconstrues *Oliveri*. As noted previously, the jurors were not instructed on reducing future losses to present worth because the trial court judge believed that the parties had agreed to withdraw the discounting task from the jury. Hence, the appeal in the federal case primarily concerned the method of discounting damage awards to present value, rather than centering on instructing the jury, as it does in the present case.

In the present case, as in *Oliveri*, the only evidence on future earnings—the figures in the economic expert's charts—had already been properly discounted, without objection, to present value. In the present case, in contrast to *Oliveri*, the jury was instructed to

return a discounted future economic loss award. Thus, the jury could have accepted John Ward's approach and included his adjustments in its future economic loss award so that no further adjustment would be warranted. In fact, no other evidence has been brought to the court's attention on which the jury could have based its computations, and ATSF has not challenged the jury's award of future economic loss as being outside the evidence. *Oliveri's* complicating factor, the jury's being instructed to return an *undiscounted* award for future economic loss, is absent. ATSF suggests that this court is bound to follow the Second Circuit court's lead in refusing to assume that the jury discounted its award for future earnings. We disagree because the differing circumstance of *Oliveri* distinguishes it from the present case on this point. In the absence of any objective indicator that the jurors failed to follow the law as expounded by the trial court, this court will not set aside a verdict on the ground that the jury disregarded instructions in reaching its decision. See, *e.g., Tos v. Handle*, 209 Kan. 139, 142, 495 P.2d 896 (1972). Thus, it would be appropriate for the court in the circumstances of the present case to assume that the jury followed the instructions to award an amount for future economic loss which had been reduced to present worth.

In testifying for Koser, John Ward informed the jury on adjusting an award for future loss downward to present worth:

"A. Present case value is what future earnings are worth today. So we are not looking at in our projections what he could have earned five years or ten years from now. We're simply saying that's the amount of money he should be awarded today if, in fact, he has lost it. What we should award is the amount of present money, not future money.

"I guess it would be if I owed someone $110,000.00 a year from now and I decided to pay off that loan one year early. And for simplicity let's assume the interest rates are now ten percent. If I went to that person and negotiated with them I should be able to convince them that I should only pay them $100,000.00 to pay off that loan today against $110,000.00 one year from now because he can take my $100,000.00 today and invest it at ten percent interest and end up with $110,000.00 a year from now.

"What I'm saying is I'm not looking at what a person's earnings is five years from now, I don't want to give him that, I want to give him a sum he can invest for five years which would equal what he could have earned five years from now.

So the loss I've calculated is significantly less than what the actual loss is. It's the present value of that loss.

"Q. Okay. These figures assume that money does earn interest?

"A. That's correct.

"Q. Right. And they assume a reasonable rate of return on the investment?

"A. Correct."

An exhibit which Ward had prepared to summarize his calculation of present value of Koser's future loss was admitted into evidence as Plaintiff's Exhibit 7. This is the chart in which Ward compared lost earnings figures for total disability and ability to work for $10 per hour. The rate of return on investment used by Ward was described as that of "a tax-free investment . . . roughly [the] 33 year average on a AAA municipal bond." On cross-examination, Ward testified that the percentage he used was 6.24. Thus, the evidence was sufficient for the jury's determining the present worth of Koser's future economic losses, but it was not sufficient for the jury's determining the discount rate, at least, not without advanced mathematics.

While it is true that Koser bore the burden of proof on damages, this is not a matter of his failing to satisfy that burden. His evidence was sufficient to support the jury's determination of damages, and ATSF has not challenged the award for future economic loss on the ground that it is not supported by the evidence. The evidence was insufficient only for the jury's determining the discount rate. ATSF has brought no indication to the court's attention of the jury's being unwilling or even hesitant to accept the discount rate used by Ward. The jury's award of $806,516 for future economic loss is within the evidence; it lies between Ward's figures for unable to work and able to work for $10 per hour—$1,076,311 and $759,438. ATSF has not shown that it was harmed by the district court's refusing to give its requested instruction. Moreover, ATSF's requested instruction had significant potential for misleading the jury. The chart which was attached to the instruction could be used for computing present worth when the discount rate was between 4% and 10%. A discount rate of approximately 2%, however, is closer to economic reality. In *Oliveri*, the economist's "income projections . . . were increased by an inflation factor of 4.1% and

then discounted by a 6.5% market discount rate using the year-by-year method." 849 F.2d at 747. The appellate court advocated that parties

"agree upon an inflation-adjusted discount rate of 2%, *i.e.*, a rate that assumes, in line with considerable historical data, that the interest rate averages close to two percentage points above the inflation rate. [Citation omitted.] Or, to put the matter differently, the true cost of borrowing money is about 2%, since lenders generally charge an interest rate that exceeds by two percentage points their estimate of the inflation rate." 849 F.2d at 746.

ATSF argues that an instruction providing the jury with "mathematical guidance" is required by *Ballantine v. Central Railroad of New Jersey*, 460 F.2d 540 (3d Cir.), *cert. denied* 409 U.S. 879 (1972). Assuming for the sake of argument that *Ballantine* sets out such a requirement and is controlling authority for this court, it would not lead to the conclusion advocated by ATSF. The evidence which ATSF has brought to the court's attention did not include facts on which the jury could have based an independent calculation of the discount rate. Nor does it appear from the record on appeal that the evidence included undiscounted figures to which the discount rate could have been applied. Without this information, mathematical guidance was useless.

The trial court instructed the jury that future economic damages are to be reduced to present value. Given the evidence in this case, the substance of ATSF's requested instruction on present value was adequately covered in the instructions given by the trial court. Thus, the trial court's refusing to give the particular instruction advocated by ATSF is not error. ATSF has not shown that the specific instruction it requested is required by federal law, nor has it shown that it was prejudiced by the district court's refusing its instruction.

We next consider if the trial court erred in not admitting ATSF's surveillance videotape of Koser into evidence. The surveillance videotape of Koser mowing grass was made in May 1991. The pretrial order, filed on July 1, 1994, provides in part: "By October 1, 1994, counsel shall exchange lists of . . . exhibits . . . . [E]xhibits not exchanged and filed as required by this order shall not be . . . . received into evidence . . . except by agreement of

counsel or upon order of the court, or in proper rebuttal." Ruling on a motion in limine, the district court excluded the surveillance videotape from evidence on the ground that ATSF had not included it in its exhibit list.

The parties agree that the standard of review is abuse of discretion. Appellate review of a trial court's decision to heed the pretrial order as well as of a trial court's evidentiary decisions is restricted to considering whether there has been an abuse of judicial discretion. See *McKissick v. Frye*, 255 Kan. 566, 577, 876 P.2d 1371 (1994); *Brown v. United Methodist Homes for the Aged*, 249 Kan. 124, Syl. ¶ 4, 815 P.2d 72 (1991).

"Judicial discretion is abused if it is arbitrary, fanciful, or unreasonable, which is another way of stating that discretion is abused only if no reasonable person would take the view adopted by the trial court. If reasonable persons could differ regarding the propriety of the action taken by the trial court, it cannot be said that the trial court abused its discretion." *Labette Community College v. Board of Crawford County Comm'rs*, 258 Kan. 622, Syl. ¶ 1, 907 P.2d 127 (1995).

ATSF's frontline position is that the videotape was included in its exhibit list as required by the pretrial order. ATSF does not contend that the videotape was included by name. Instead, it argues that it was included within one of the categories of exhibits it listed.

In May 1994, ATSF refused to answer Koser's interrogatories about videotapes and surveillance, claiming privilege and work product protection. In addition, in response to Koser's request to produce relevant "pictures of any kind or nature," ATSF stated that photos already had been produced. Koser's September 1994 exhibit list included "Defendant's Notice of Compliance to Request for Production and documents produced." ATSF's October 1994 exhibit list included "All relevant documents attached to depositions taken in this case" and "All exhibits listed by plaintiff." In mid-January 1995, Koser asked ATSF to update its answers to interrogatories and its Notice of Compliance to Request for Production. On January 26, ATSF revealed the existence of the May 1991 surveillance videotape, but did not produce it. During the January 31, 1995, video deposition of Dr. Cook, the surveillance videotape, which had been provided to the plaintiff's witness

by ATSF, "was marked as an exhibit attached to the deposition." This was a year and a half after the court entered the pretrial order and only 3 weeks prior to trial.

ATSF contends that the surveillance videotape was either a " 'document produced in response to the Notice for Compliance' or . . . an 'exhibit attached to Dr. Cook's deposition.' " With respect to the first alternative, Koser asserts that the videotape was never provided to him. ATSF claims otherwise. ATSF states: "The record, however, indicates that the surveillance videotape was provided to plaintiff's counsel well before trial." The record does not support ATSF's claim to have provided the videotape to plaintiff's counsel. In fact, ATSF's updated answer to one of the interrogatories gives the location of the videotape as in the possession of ATSF's counsel. There can be no doubt, however, that, at least after Dr. Cook's deposition was taken on January 31, the videotape was available to Koser.

ATSF's second alternative argument is that the surveillance videotape was included in ATSF's exhibit list in the category of "all relevant documents attached to depositions."

One of ATSF's secondary arguments is that "[t]he Pretrial Order should have been amended." ATSF asserts: "On the first morning of trial, the trial court also refused to amend the Pretrial Order and Santa Fe's designations thereunder to specifically include the surveillance videotape." ATSF does not give a record reference for this assertion. Koser asserts that at that time ATSF did not request an amendment to the pretrial order, and, of course, the trial court did not deny such a motion. ATSF does not mention amendment of the pretrial order in its reply brief. However, what needed amending, if anything, was the exhibit list, not the pretrial order.

Another argument is that the district court treated ATSF less favorably than it treated Koser. According to ATSF, this double standard, as demonstrated in the district court's excluding the videotape, constitutes an abuse of judicial discretion. ATSF argues: "The trial court erroneously applied a narrow, restrictive reading of the *Pretrial Order*—particularly in light of the liberality afforded the plaintiff with respect to deadlines encompassed by the *Pretrial Order*." ATSF identifies as one such incident that the district court

permitted Koser to file his motion in limine 3 days after the deadline set by the pretrial order for filing pretrial motions and then ruled in Koser's favor, excluding the videotape. Although this assertion cannot be verified from the record on appeal, in his responsive brief Koser concedes: "It is true as defendant states that plaintiff's Motion in Limine was filed with the court on the morning of trial." If the district court's entertaining the pretrial motion is any indication of partiality, however, it is a feeble one. It is clear from the record that the trial court did not prohibit references to the surveillance videotape. Not only was it freely mentioned in testimony, it also was discussed by counsel in opening statement and closing argument. The ruling covered only admissibility of the videotape into evidence. In other words, the effect of the ruling was not to shield the jury from any exposure to the subject. Thus, this was not a ruling which Koser needed to seek in advance of trial by way of a motion in limine, which has as its main purpose the prevention of prejudice by stifling potential for it. It was a ruling which as easily and as effectively could have been made upon an evidentiary objection during the course of trial. Thus, the trial court's entertaining Koser's motion 3 days after the deadline set by the pretrial order for the filing of motions in limine is not convincing proof of discretion being unevenly exercised, let alone abused.

Finally, ATSF argues that the surveillance videotape should have been admitted after Koser "opened the door." ATSF's bases for arguing that the door had been opened include discussion or mention of the tape in Koser's counsel's opening statement; Dr. Cook's deposition, which was read to the jury; Doug Shaw's deposition, which was read to the jury; and Dr. Abrams' testimony at trial.

ATSF's theory about the inadmissibility of the evidence introduced in each of the "door-opening" instances is stated as follows: "Given plaintiff's motion in limine excluding the surveillance videotape from evidence, any references by the parties to the contents and impact of the surveillance videotape should have been inadmissible." As already noted, the motion in limine does not seem to be a part of the record on appeal. Nor does the ruling. The scope of neither, therefore, is established. This court has repeatedly

stated that an appellant has the burden to designate an adequate record and failure to do so ensures that appellant's claim of error will fail. See, *e.g., McCubbin v. Walker,* 256 Kan. 276, 295, 886 P.2d 790 (1994).

With regard to this notion of opening the door, Koser argues that the principle has no application in the present case. He contends that cases cited by ATSF show that the principle becomes applicable where the evidence which opened the door would be contradicted by the evidence sought to be admitted. *Laterra v. Treaster,* 17 Kan. App. 2d 714, 844 P.2d 724 (1992), best illustrates the frailty of this proposition. Steven Laterra died as the result of the negligence of the decedent, for whose estate Treaster was administrator. Laterra's son sued. On a motion in limine the trial court ruled that evidence of Steven Laterra's conviction of indecent liberties with a child "was not to be admitted due to its prejudicial nature *unless* [his son's] counsel opened the door by eliciting testimony that [Steven] Laterra was a good, moral, and law-abiding person." (Emphasis added.) 17 Kan. App. 2d at 716. In other words, the trial court's initial ruling was conditional. By this device, the trial court sought to prevent the plaintiff's taking advantage of the circumstance to pour an inaccurate and/or incomplete picture of Steven Laterra's moral character into the void of information created by the preliminary exclusion of evidence of his conviction.

In the present case, the trial court's ruling on the motion in limine was not expressly conditional. This was not a case in which the trial court judge excluded the videotape unless Koser's counsel elicited evidence of his condition or activities which was in conflict with what was depicted in the videotape. By its nature, however, a ruling on a motion in limine always is subject to change. In *Laterra,* the Court of Appeals stated:

" '[T]he primary purpose of the motion in limine is to prevent prejudice during trial.' *State v. Quick,* 226 Kan. 308, 311, 597 P.2d 1108 (1979). Such an order is temporary in nature and is entered before trial when no one knows exactly what will turn up later during trial. 'It is possible events during the trial, bearing directly on questions of relevance, may support a change in the protective order.' 226 Kan. at 312." 17 Kan. App. 2d at 717.

Where, as here, there was no express condition for reversing the ruling on a motion in limine, any change in the excluding order is

a matter of judicial discretion. In this case ATSF has shown no abuse of the trial court's discretion.

The judgment of the district court is affirmed.