No. 103,674

STATE OF KANSAS, *Appellee*, v. RYAN COX, *Appellant*.

(304 P.3d 327)

Opinion filed June 21, 2013.

*Rebecca L. Kurz*, of Morgan Pilate LLC, of Olathe, argued the cause and was on the briefs for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, argued the cause, and *Lee J. Davidson*, assistant attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: This is defendant Ryan Cox's direct appeal from jury convictions of two counts each of aggravated criminal sodomy and aggravated indecent liberties with a child. He was sentenced to concurrent prison terms of 165 months on each sodomy count and 61 months on each indecent liberties count. Because his constitutionally protected right to a public trial was violated when the district court closed the courtroom during display and discussion of photographs of the victims' genitalia, we must reverse the convictions and remand for a new trial. In addition to analyzing the

public-trial claim, we review only those among Cox's other appellate issues that are likely to arise again upon retrial.

## FACTUAL AND PROCEDURAL BACKGROUND

Cox began dating the mother of the two victims (Mother) in April 2000, when he was 18 and she was 19. During the course of their ensuing 7-year relationship, they had various residences, sometimes together and sometimes apart. Mother had two daughters from a prior relationship, C.W. and M.W. Since their birth, the girls had resided with Mother's mother (Grandmother). In 2004, Mother and Cox had a son together. In March or April of 2007, they purchased a house and, for the first time, began living together with the three children. Four months later, C.W. and M.W. told Grandmother that Cox had been sexually abusing them.

At trial, Grandmother testified that the girls were complaining one night that they did not want to go home with Cox. When Grandmother asked them why, M.W., 9 years old at the time, told her, "[Cox] hurts us." C.W., then 7 years old, made a similar statement, and the girls told Grandmother that Cox made them "watch dirty stuff on his computer" and put his "thingy" in their mouths and in their "girl parts." Grandmother called Mother at work and relayed what the girls had said.

After learning of the girls' accusations, Mother immediately called Cox and told him generally what the girls had said. He denied the accusations and told Mother that the girls were making them up. When Mother got off work early the next morning, she picked the girls up and took them to the police station. There, Tammy Hinman, a social worker with the Department of Social and Rehabilitation Services (SRS), now the Department of Children and Families, interviewed the girls individually. These interviews were videotaped, and the tapes were played to the jury at trial.

In her interview, M.W. was reticent; but she identified Cox as the person who had been hurting her and indicated that she was afraid of him. She responded affirmatively when asked if he had touched her on her girl parts, if he had touched her with his hands, and if he had touched her with another part of his body. She re-

sponded affirmatively when asked if Cox had put his boy parts into her mouth and on her girl parts. She said that one time Cox had put his boy part into her bottom, but she screamed and he stopped. She said Cox would take her sister out of the room the two girls shared, and she had heard her sister protest that Cox promised he would not do it anymore.

C.W. was more forthcoming about Cox "doing some bad stuff to us." She said, "[Cox] makes us suck his penis." A few times, she said, she saw "white stuff" come from his penis. She also said Cox had tried to put his penis in her bottom once and got "a little bit inside"; but she screamed, so he just put it in her mouth. She said that one night Cox came for her sister and "tried to go inside her," but she screamed.

Both girls said that Cox made them watch bad movies, some depicting grown-ups and some depicting men and little girls.

A few days after the girls made their accusations, sexual assault nurse examiner (SANE) Jan Owens examined them. Owens took photographs during the examinations. At the State's request and over a defense objection at trial, the district court judge closed the courtroom to spectators while pictures of the girls' genitalia were exhibited and discussed. The judge attributed the closure to "the personal nature of the photographs." As soon as the photographs were removed from view, members of the public were allowed back into the courtroom.

At trial, Owens described how the photographs of the victims' genitalia compared to diagrams of the genitalia of typical girls about the same age. Owens found no acute or healed trauma, but she did find an unusual "lack of hymenal tissue"; she testified that she had never examined a child with such limited amount of tissue. On both girls, the hymenal tissue was "thinned"; the vaginal wall was "exposed"; and there was "narrowing." Owens testified that these are three of four possible signs that raise suspicions of sexual abuse, and they could be consistent with penetration or rubbing.

KBI Special Agent Steve Rosebrough conducted interviews with each of the girls immediately after their SANE exams. His interviews also were videotaped, and the tapes were played for the jury. In the Rosebrough interviews, the girls repeated their previous

allegations against Cox. Rosebrough testified on cross-examination that he did not do any follow-up investigation into possible motives for the girls' allegations, because he did not believe they were lying.

Rosebrough also testified that he interviewed Cox and executed a search warrant at Cox's house. The search uncovered a single disc containing adult pornography; it was later suggested that it belonged to Cox's friend. Rosebrough discovered no child pornography in the home or on Cox's computer. He testified that Cox was nervous but cooperative during his interview; Cox denied sexual activity with the girls.

Other testimony at trial revealed that, during the first few days after the allegations surfaced, Mother was going back and forth from her mother's house, where the girls were staying, to the house she shared with Cox. Mother testified that she spent the night at Cox's house one night but that Cox was not home. She testified that she was very angry during this time. Grandmother testified that Mother initially defended Cox. Hinman testified that she believed Mother was in denial and "didn't seem fully ready to accept that what her children had revealed could possibly be the truth." Apparently because Mother was still in contact with Cox, the girls were taken into the custody of SRS. After Mother severed ties with Cox, she and the girls returned to live with Grandmother.

Both girls testified at trial.

C.W.—then 10 years old—testified that she had watched "nasty movies" with Cox, in which people were having "S-E-X." She testified that, at night, Cox would come to get her and her sister out of bed and do "bad stuff" to them; he made them touch his penis with their hands and mouths; he touched their "girl parts" with his penis and hands; and, when he put his penis in their mouth, white stuff would come out. She testified that she and M.W. never told anyone because "he said not to" and they were afraid.

M.W.—11 years old at the time of trial—also testified that Cox made her watch movies in which people were doing "bad stuff." She testified, with difficulty, that Cox would sometimes touch his boy part to her girl part and mouth and that he would touch her between her legs.

Cox's evidence consisted largely of testimony supporting his good character. His mother testified that, when Cox told her about the allegations, she knew they were false. She told the jury:

"I know my son and I know he has a very strong sense of right and wrong and I know he's very sure on what is moral and what is immoral. He's been raised that way. And he just has a strong sense of what's moral and this is immoral and he would not do anything immoral."

Cox's longtime childhood friend, Logan Modica, testified that, throughout the course of Cox's relationship with Mother, Cox had very little to do with the girls because they were always with their grandmother. When Cox told him about the allegations that he had molested the girls, Modica was "shocked." Modica spent most of the days following the girls' initial allegations at Cox's house. He testified that Mother came over to stay one night, and Cox and Mother had sex. Modica testified that he and Cox have remained good friends. Cox, Modica said, is "a very good person"; someone you can "count on"; and, despite the allegations in this case, Modica would have no qualms about his own daughter being alone with him.

Another longtime friend, Jared Essig, testified that he "couldn't believe" the girls' accusations. He testified that Cox was "a person I trust, person I respect, and a person . . . I consider one of my best friends."

Rikki Hess, also a longtime friend of Cox, testified that she would have no qualms about Cox being around her three children because Cox is "a good guy . . . a great friend . . . trustworthy . . . dependable" and "a good-standing member of this community."

Cox also testified at trial. He told the jury about Mother's telephone call relaying the girls' accusations. He was "stunned and shocked" and "didn't know exactly what to think. I knew it wasn't true but I had no idea what to do or say." He thought maybe the girls just made it up in order to stay at Grandmother's house. He did not think it was serious until Mother told him she had taken the girls to the police and they were going to proceed with an investigation. He nevertheless believed Mother was supporting him, and he believed an investigation would be a good thing be-

cause it could get to the bottom of the situation. Then Mother cut ties with him, telling him that they could not be together anymore and that she was sorry. He testified that he had not abused the girls.

Generally, the defense theory of the case was that the girls had manufactured the allegations against Cox because they wanted to live with Grandmother; Mother did not believe that Cox had committed the charged acts but had had to sever her relationship with him in order to regain and retain custody of her children.

The jury returned guilty verdicts on all counts. In anticipation of sentencing, the district judge received nearly 150 pages of letters from numerous individuals in support of Cox. This appeal followed sentencing.

## DISCUSSION

### Right to Public Trial

Cox challenges the district court's decision to clear the courtroom during the testimony of Owens, while her photographs of the victims' genitalia were displayed and discussed. Cox suggested that, rather than display the photographs, the district judge could pass the photographs to the jury. This suggestion was summarily rejected out of hand. The judge announced that the courtroom would be cleared "because of the personal nature of the photographs." As soon as the "graphic images" were no longer displayed, members of the public were allowed back into the courtroom.

On appeal, Cox argues that the district court's failure to make adequate findings, balance the competing interests involved, or consider lesser alternatives to closing the courtroom violated his Sixth Amendment right to a public trial under the United States Constitution. He argues that this violation requires reversal, even if the outcome of the trial would have been the same. We are compelled to agree.

We first address the State's suggestion that this issue was not preserved for appeal. Although Cox's counsel stated that he understood the basis for the State's request and he agreed the spectators would probably not want to see the photographs, the record reveals his concern for "cutting off [] a public trial" and his request

that the court "note an objection . . . for the duration of those portions." This was sufficient to preserve the public trial issue for our review.

The parties agree that the court's review of this constitutional question is unlimited. See, *e.g.*, *State v. Garcia*, 285 Kan. 1, 7, 169 P.3d 1069 (2007). " 'The Sixth Amendment to the United States Constitution guarantees that in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury.' " *State v. Kirby*, 272 Kan. 1170, 1196, 39 P.3d 1 (2002) (quoting *State v. Jenkins*, 269 Kan. 334, 337, 2 P.3d 769 [2000]). This court has stated:

"One of the fundamental rights of a criminal defendant is his right to a public trial. Trial court proceedings are generally required to be open and public, and a public trial is one which is public in the ordinary, common-sense meaning of the term. A public trial is not solely a private right of the parties, but one involving additional interests, including those of the public. The concept of a public trial implies that doors of the courtroom be kept open and that the public, or such portion thereof as may be conveniently accommodated, be admitted, subject to the right of the court to exclude objectionable characters." *State v. McNaught*, 238 Kan. 567, 577, 713 P.2d 457 (1986) (citing 75 Am. Jur. 2d, Trial § 33, p. 146).

This right, while fundamental, is not inviolate. The United States Supreme Court has consistently held that

" 'the right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information.' [Citation omitted.] 'Such circumstances will be rare, however, and the balance of interests must be struck with special care.' " *Presley v. Georgia*, 558 U.S. 209, 213, 130 S. Ct. 721, 175 L. Ed. 2d 675 (2010) (quoting *Waller v. Georgia*, 467 U.S. 39, 45, 104 S. Ct. 2210, 81 L. Ed. 2d 31 [1984]).

The watershed case of *Waller* set out an oft-cited, four-part test:

"[T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." 467 U.S. at 48.

See *Presley*, 558 U.S. at 212-15; *Press-Enterprise Co. v. Superior Court of Cal.*, 464 U.S. 501, 511, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984).

Kansas courts have employed this test in evaluating whether the Sixth Amendment right to a public trial has been violated. See *State v. Dixon*, 279 Kan. 563, 597, 112 P.3d 883 (2005), *overruled on other grounds by State v. Wright*, 290 Kan. 194, 224 P.3d 1159 (2010).

The record in this case demonstrates failure on all four fronts. The district judge's wholesale closure of the courtroom during the presentation of this evidence, in the absence of the State or the judge expressing any "overriding interest" combined with the lack of meaningful consideration of alternatives, violated Cox's Sixth Amendment right to a public trial. See *Presley*, 558 U.S. at 214-15 (trial court required to consider alternatives to closure even when not offered by parties); see also *Dixon*, 279 Kan. at 596-601 (trial court violated defendant's right to a public trial by excluding media and spectators from the courtroom prior to reading of jury verdicts, despite articulated interest to be served by closure, findings on reasonable alternative means); *State v. Barnes*, 45 Kan. App. 2d 608, 613-15, 251 P.3d 96 (2011) (when jurors complained of defendant's sister taking photographs of them from gallery, trial court's decision to deny all public access to rest of trial, rather than choosing lesser remedy such as barring sister's attendance, violated fundamental right to public trial, even though both parties had rested).

The State's suggestion, at oral argument, that Cox had a duty to request specific findings, is not supported by authority. The judge's independent duty to ensure that a criminal defendant receives a fair trial is, in contrast, well established. See, *e.g.*, *State v. Adams*, 284 Kan. 109, 123-24, 158 P.3d 977 (2007).

Having concluded there was a violation of constitutional magnitude, we must determine the appropriate remedy. Under this court's precedent, as well as that of the United States Supreme Court, we must reverse. A defendant is not required to prove specific prejudice in order to obtain relief for a violation of the public-trial guarantee. *Waller*, 467 U.S. at 49-50; *Levine v. United States*, 362 U.S. 610, 627 n.1, 80 S. Ct. 1038, 4 L. Ed. 2d 989 (1960) (Brennan, J., dissenting) ("[T]he settled rule of the federal courts

[is] that a showing of prejudice is not necessary for reversal of a conviction not had in public proceedings.").

Both the United States Supreme Court's *Waller* decision and this court's *Dixon* decision held that a public-trial violation could not be considered harmless error. Accord *Barnes*, 45 Kan. App. 2d at 612-15; but see *State v. McWilliams*, No. 105,292, 2012 WL 3171794, at *10-11 (Kan. App. 2012) (unpublished opinion) (when court open during jury selection, opening statements, presentation of evidence, closing arguments, instructions, no reversible error arises from read-back of testimony in open court but outside presence of public). And the facts of this case present a significantly more egregious violation than those presented in either *Waller* or *Dixon*.

In *Waller*, the United States Supreme Court applied the right to a public trial to a defendant's suppression hearing. The district judge had failed to satisfy the four-part test because his findings were broad and did not justify closure of the entire hearing; also, the judge had not considered alternatives to immediate closure. The *Waller* Court acknowledged that a defendant need not prove prejudice when this type of violation occurred, but, opining that "the remedy should be appropriate to the violation," it remanded for a new suppression hearing, noting that, if it resulted in the same decision, a new trial would not be necessary. "[A] new trial presumably would be a windfall for the defendant, and not in the public interest." 467 U.S. at 49-50.

In our *Dixon* case, defendant Wallace Dixon was on trial for two counts of felony murder, among other charges. His coconspirator faced similar charges and was to be tried immediately after Dixon. The coconspirator's jury was picked but not yet empanelled. To prevent the coconspirator's jury from being tainted by learning of the verdicts in the Dixon trial, the district judge closed the courtroom to media and all spectators other than the victim's parents before the verdicts were read. Although the judge went to "great lengths" to articulate the reasons for closure, we held that the presumption of openness was not overcome. *Dixon*, 279 Kan. at 599-601. Despite the "lack of effect on the verdicts," the error violated Dixon's substantial rights and therefore was not harmless. *Dixon*,

279 Kan. at 601 (relying on, *inter alia, United States v. Canady,* 126 F.3d 352 [2d Cir. 1997], *cert. denied* 522 U.S. 1134 [1998]).

Other courts have also held that, when the Sixth Amendment right to public trial has been violated, the harmless error rule does not apply. See *United States v. Hernandez,* 608 F.2d 741, 747 (9th Cir. 1979); *United States ex rel. Latimore v. Sielaff,* 561 F.2d 691, 694-95 (7th Cir. 1977), *cert. denied* 434 U.S. 1076 (1978); *United States ex rel. Bennett v. Rundle,* 419 F.2d 599, 607-08 (3d Cir. 1969); *Kelly v. Meachum,* 950 F. Supp. 461, 468 (D. Conn. 1996); *Consentino v. Kelly,* 926 F. Supp 391 (S.D.N.Y.), *aff'd* 102 F.3d 71 (2d Cir. 1996); see also *Webber v. Scott,* 390 F.3d 1169, 1176 (10th Cir. 2004) (citing *Waller* as support for holding violation to be structural error); *People v. Jones,* 47 N.Y.2d 409, 416, 418 N.Y.S.2d 359, 391 N.E.2d 1335 (1979) ("The harmless error rule is no way to gauge the great, though intangible, societal loss that flows" from closing courthouse doors).

Here, closing the courtroom's doors during the presentation of Owens' testimony concerning her examination of the victims' genitalia was not a "minor violation[] of the public trial guarantee." *Dixon,* 279 Kan. at 600. The district judge failed to articulate the interests at stake or the alternatives considered, which prevents us from conducting a proper review. Reversal is required.

" '[T]he failure to record any purported compelling reasons justifying closure precludes a proper review by this court and mandates a reversal of defendant's conviction. [Citations omitted.] A courtroom may be closed where an overriding interest to preserve higher values is demonstrated (see *Waller v. Georgia,* 467 U.S. [at 45]). However, this interest must be articulated along with findings that are specific enough to permit a reviewing court to determine whether closure was warranted. [Citation omitted.]' " *Dixon,* 279 Kan. at 598 (quoting *People v. Martinez,* 172 A.D.2d 428, 429, 568 N.Y.S.2d 940 [1991]).

The State suggests that there is precedent for remanding to the district court for a post-hoc articulation of the facts and reasoning for the judge's decision. It directs us to *United States v. Galloway,* 937 F.2d 542, 546-47 (10th Cir. 1991). But Cox correctly distinguishes that case. *Galloway* did not involve a total closure of the courtroom, and the United States Court of Appeals for the Tenth Circuit specifically drew and relied upon this distinction when it

remanded Galloway's case rather than reversing it. It noted its development of " 'a more lenient standard for closure orders which only partially exclude the public or are otherwise narrowly tailored to specific needs.' " 937 F.2d at 546 (quoting *Davis v. Reynolds*, 890 F.2d 1105, 1109 [10th Cir. 1989]).

We also do not find persuasive the reasoning of a minority of our sister state courts holding that failure to make findings to support closure can be remedied by remand. *State v. McRae*, 494 N.W.2d 252, 260 (Minn. 1992) (granting new trial for combination of errors; suggesting that "[i]f a remand for a hearing on whether there was a specific basis for closure might remedy the violation of closing the trial without an adequate showing of the need for closure," then initial remedy remand, not retrial); *State v. Rollins*, 221 N.C. App. 572, 576-79, 729 S.E.2d 73 (2012) (noting split of authority concerning remedy; state statute permits exclusion of public during victim's testimony in sex crime case). These cases were focused on finding an appropriate remedy for a trial court's failure to make adequate findings to justify closure under the fourth prong of the *Waller* test. Here, the district judge failed to meet any of *Waller*'s requirements. Where there has been structural error in the trial, we will not retain jurisdiction or remand for a district judge to manufacture an after-the-fact rationale that is constitutionally defensible.

There is no cure short of reversal and remand for new trial here. In light of this conclusion, our analysis of Cox's other issues on appeal is limited to the extent those issues might arise again on retrial.

### Third-Party Evidence

Before Cox's trial, the State filed a motion in limine to prevent him from offering evidence that a third party, Mother's father (Grandfather), may have inappropriately touched the victims. Cox was prepared to present evidence that Mother herself believed that if anyone had abused her children, it was her father; that a young girl had previously accused Grandfather of sexually abusing her; and that Grandfather had regular, unsupervised access to the girls. The State admitted that Grandfather had been "accused of touch-

ing a young girl many years ago" but argued that the assertion he had abused M.W. and C.W. was speculative. The district court granted the State's motion.

During trial, Cox again proffered the third-party evidence for impeachment of Mother, *i.e.*, to demonstrate that she did not initially believe the girls. The district court sustained the State's objection to the proffered evidence.

On appeal, Cox argues that this evidence was an integral part of his defense and that his inability to present it to the jury violated his constitutional right to a fair trial.

Generally, evidence of the motive of a third party to commit the charged crime, standing alone, is not relevant, but such evidence may be relevant if there is other evidence connecting the third party to the crime. A district judge must evaluate the totality of facts and circumstances in a given case to determine whether a defendant's proffered evidence effectively connects the third party to the crime charged. See *State v. Inkelaar*, 293 Kan. 414, 439-40, 264 P.3d 81 (2011); *State v. Brown*, 285 Kan. 261, 303-04, 173 P.3d 612 (2007); accord *State v. Tahah*, 293 Kan. 267, 274, 262 P.3d 1045 (2011). A district judge's decision on this matter is reviewed for abuse of discretion. 293 Kan. at 274.

Although our caselaw on the admissibility of third-party evidence has not always been a model of clarity, we have no trouble concluding that the district judge did not abuse his discretion by excluding the evidence offered by Cox here. The victims specifically identified Cox and only Cox as their abuser. They expressly denied that anyone else had touched them. In his interview with M.W., Rosebrough asked her whether anyone other than Cox had touched her, and M.W. said, "No." Hinman asked C.W. if anyone else had ever touched her or put his penis in her mouth, and she said, "No." Rosebrough asked C.W. if Grandfather had touched her, and C.W. said, "No."

Mother's statement about her suspicion that her father was the girls' abuser—without more than a vague reference to a past accusation of him by another young girl and his mere opportunity to commit the crimes at issue in Cox's trial—was mere speculation. It did not qualify as admissible third-party evidence connecting her

father to the crimes charged here. Compare *Inkelaar*, 293 Kan. at 439-42 (in rape, aggravated indecent liberties prosecution, proper to exclude evidence that child victims' father committed crimes; allegations father's half-brother made against father did not involve victims, allegedly occurred before victims were born; incidents leading to report of abuse occurred while victims with defendant, father out of town; victims identified only defendant as perpetrator); *State v. Adams*, 280 Kan. 494, 507, 124 P.3d 19 (2005) (no abuse of discretion in excluding evidence in shaken baby case, that mother had previously abused her own child, was permitted only supervised visits with that child, had been aggressive toward victim in weeks preceding victim's death; no evidence placed mother at scene of injury during relevant time frame; defendant's "effort to pin blame on [third party] amounted to baseless innuendo"); *State v. Hooker*, 271 Kan. 52, 64-66, 21 P.3d 964 (2001) (no error in excluding testimony that two other people had threatened to harm murder victim; defendant failed to connect two other persons with victim's death; State connected defendant with victim's murder through eyewitness testimony); with *State v. Marsh*, 278 Kan. 520, 532-33, 102 P.3d 445 (2004), *rev'd on other grounds Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 16 L. Ed. 2d 429 (2006) (exclusion of third-party evidence in double homicide error; defendant proffered evidence of mixture of third-party's blood, blood of one victim on defendant's shoes); *State v. Evans*, 275 Kan. 95, 105-06, 62 P.3d 220 (2003) (when evidence showed third person seen holding murder weapon immediately after fatal shot fired, district judge erred in excluding other evidence that same third party had admitted to shooting victim, dumping the body).

## Nonstandard Character Evidence Instruction

We turn next to Cox's claim that the district court erred in failing to give his requested instruction on character evidence. It read:

"Ryan Cox has offered evidence of someone else's opinion as to his good character. You should consider such evidence along with all the other evidence in this case.

"Evidence of good character alone may be sufficient to raise a reasonable doubt whether the defendant is guilty, because you may think it improbable that a person of good character would commit such a crime. Evidence of a defendant's char-

acter, inconsistent with those traits of character ordinarily involved in the commission of the crime charged, may give rise to reasonable doubt.

"You should also consider any evidence offered to rebut the evidence offered by defendant.

"You should always bear in mind, however, that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence."

This instruction appears in the Tenth Circuit Court of Appeals' Criminal Pattern Jury Instructions but not in the Pattern Instructions for Kansas (PIK). Although use of PIK instructions is not mandatory, it is strongly recommended. *State v. Dixon*, 289 Kan. 46, 67, 209 P.3d 675 (2009).

When a criminal defendant has requested a jury instruction that the district judge declines to give, that decision is reviewed as a question of law. *State v. Plummer*, 295 Kan. 156, 162, 283 P.3d 202 (2012). Typically, the analysis turns on whether the instruction was legally appropriate and factually supported. *Plummer*, 295 Kan. at 162. If, however, the legally appropriate substance of the requested instruction is adequately covered in other instructions, the instructions given fairly and accurately state the law as it applies to the facts of the case, and additional considerations weigh against inclusion, then we will not find error in the refusal to give the instruction. *Koser v. Atchison, Topeka & Santa Fe Ry. Co.*, 261 Kan. 46, 51, 928 P.2d 85 (1996).

We hold there was no error in the district judge's decision not to include Cox's version of the instruction, because the instructions given at Cox's trial fairly and accurately stated the law and the legally appropriate substance of the requested non-PIK instruction was covered by other PIK instructions, including the general witness credibility instruction of PIK Crim. 3d 52.09. See *State v. Appleby*, 289 Kan. 1017, 1059, 221 P.3d 525 (2009) (instructions as whole that fairly, properly state law, do not mislead upheld). More importantly, there is precedent for the district judge's conclusion that the requested instruction would unduly emphasize character evidence and thereby mislead the jury. See *Petersen v. United States*, 268 F.2d 87, 90 (10th Cir. 1959) (Murrah, J., spe-

cially concurring) (" 'Evidence of good character is to be used like any other . . . and the less [the jurors] are told about the grounds for its admission, or what they shall do with it, the more likely they are to use it sensibly.' " [quoting *Nash v. United States*, 54 F.2d 1006, 1007 (2d Cir. 1932)]).

## *Judicial Bias*

One final issue bears mention before we conclude. At Cox's trial, the district judge denied a State request to clear the courtroom of spectators while two of the child victims testified. The prosecutor believed the victims were "greatly intimidated by [Cox's] family." Despite his ruling, before C.W. was called to the witness stand, the district judge *sua sponte* and in the presence of the jury stated, "Before the next witness comes in, I just want to remind the spectators, any participants, that they are not to try to influence or intimidate the witnesses in any way. If I see anything like that happening, you will be removed from the courtroom and possibly subject to contempt." Defense counsel did not object to this statement at the time, but Cox claimed on appeal that this statement constituted judicial misconduct. See *State v. Kemble*, 291 Kan. 109, 113, 238 P.3d 251 (2010) (lack of a contemporaneous objection does not foreclose review). Because Cox is entitled to a new trial, we need not analyze the claim; but we caution the district judge not to make such a statement again in front of the jury.

## CONCLUSION

Defendant Ryan Cox's convictions for aggravated criminal sodomy and aggravated indecent liberties with a child are reversed; and this case is remanded to district court for a new trial because Cox's right to a public trial was violated. On retrial, Cox's third-party evidence, assuming it takes the same form and contains no more relevant information than the evidence proffered during the first trial, shall be inadmissible. Assuming the evidence from both parties at retrial is substantially the same, Cox will not be entitled to the jury instruction on character evidence that he sought at his first trial. Finally, we caution the district judge to refrain from

admonishing spectators about witness intimidation in the presence of the jury.

Reversed and remanded with directions.