NOT DESIGNATED FOR PUBLICATION

No. 111,430

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

REGINALD VAUGHN,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; WARREN M. WILBERT, judge. Opinion filed January 29, 2016. Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, for appellant.

*Lesley A. Isherwood*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., BUSER and SCHROEDER, JJ.

*Per Curiam*: Reginald Vaughn appeals his convictions on seven counts of kidnapping (K.S.A. 2015 Supp. 21-5408[a][2], [c][1]) and one count each of aggravated robbery (K.S.A. 2015 Supp. 21-5420[b][1], [c][2] and K.S.A. 2015 Supp. 21-5420[b][1]), attempted aggravated robbery (K.S.A. 2015 Supp. 21-5301[a], [c][1]), and aggravated burglary (K.S.A. 2015 Supp. 21-5807[b], [c][3]). Vaughn challenges the sufficiency of the evidence in support of the kidnapping convictions, the admission of evidence at trial, and the jury instructions. Having carefully reviewed the parties' briefs and the record on appeal, we find no reversible error and, therefore, affirm the convictions.

1

FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of April 13, 2012, John Ringer, Patricia Merritt, and Robert Dale were on the front porch of a Wichita residence. Randy Hula, Tony Hula, John Krieger, and Cory Vanboening were sleeping in bedrooms of the residence. Ringer's infant son was in the basement.

Vaughn and three other male accomplices approached the victims on the porch, pointed two pistols at them, and ordered them to the ground. Ringer testified that he could hear the intruders talking and "[t]hey thought that we should probably go inside, be in the front room" because "[t]hey needed to get us under control." The accomplices moved the victims at gunpoint from the porch into the living room.

The intruders ordered the three victims to sit in the living room, and one of them detained the victims with a pistol. The other accomplices went throughout the house armed with the other pistol, looking for electronic equipment and money. The intruders eventually brought the four remaining adult victims into the living room.

The intruders switched off guarding the victims in the living room, passing back and forth pistols as they assumed or relinquished guard duty. Randy Hula testified that "after we were moved into the living room," Vaughn "was standing . . . with the black gun . . . [a]nd he held us there, basically told us to be quiet. We are taking your stuff. Don't move or I will shoot you."

Ringer told the intruders that his infant son was in the basement, and Merritt was allowed to retrieve the child. Merritt was alone for a moment and she managed to call 911 before hearing some of the accomplices coming down the stairs. The men took some money from Merritt's presence in a basement bedroom and led her back to the living room.

2

One of the intruders left to get a car. Tony Hula testified the remaining men "were asking me for trash bags so they could put my things in them, and they were moving things and kind of piling it up so they could get it organized to move out of the house when they had their car ready." Tony had a jar of marijuana in his room, and the assailants took that as well.

While the home invasion was occurring, one of the intruders looked out the front door and saw police approaching the house. Three intruders in the house, including Vaughn, ran out the back door to escape.

Police officers believed Vaughn and another intruder were raising pistols in their direction. The officers opened fire, seriously injuring Vaughn and killing an accomplice. The intruder who had left for the car, Bradlee Ohle, was later captured in Salina.

Vaughn spent a few days in the hospital under police custody. During his hospitalization, Vaughn made inculpatory statements which he unsuccessfully moved to suppress as evidence before trial.

At trial, Vaughn testified on his own behalf. According to Vaughn, he and the other intruders visited the house intending only to buy marijuana from Tony Hula and the 911 call was prompted by an altercation between his group and Hula. The jury returned guilty verdicts on all the charges but aggravated assault of a law enforcement officer, on which the jury was unable to unanimously agree. Vaughn appeals.

SUFFICIENCY OF THE EVIDENCE OF KIDNAPPING

Vaughn contends the evidence was insufficient to convict him of kidnapping because the movement of the victims from their initial locations to the living room was "inherent in the robbery" and did not facilitate the commission of the crime.

3

Our standard of review provides: "In determining whether the State has produced sufficient evidence to sustain a conviction, this court reviews all the evidence in the light most favorable to the prosecution and determines whether it is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Bollinger*, 302 Kan. 309, 313, 352 P.3d 1003 (2015).

The jury was instructed to decide for each of the kidnapping counts whether Vaughn "took or confined" a victim "by force or threat" and whether Vaughn had done so "with the intent to hold" the victim "to facilitate the commission of any crime." See K.S.A. 2015 Supp. 21-5408(a)(2).

> "*If a taking or confining is alleged to have been done to facilitate the commission of another crime, to be kidnapping the resulting movement or confinement*: (a) must not be slight, inconsequential, and merely incidental to the other crime; (b) must not be of a kind inherent in the nature of the other crime; and (c) must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection." *State v. Burden*, 275 Kan. 934, 943, 69 P.3d 1120 (2003).

*Was There a Taking?*

We first consider whether there was a taking of the victims to facilitate the crimes of aggravated burglary, aggravated robbery, and attempted aggravated robbery. The four intruders were faced with seven adult victims, six of whom were men. At least six of the victims were in their 20s or early 30s, including the three on the front porch. The four intruders had only two pistols (one being a .22 caliber firearm) between them and a pocketknife.

The intruders, therefore, faced a control problem if they were to enter the house, search for valuables, transport the valuables to their car, and make an escape from the

4

crime scene. Viewing the evidence in the light most favorable to the State, the intruders' plan was to move the three victims from the porch to the interior of the house and then to move the other victims to the same location. The intruders left one pistol with whomever was guarding the victims, and they then carried the second pistol throughout the house to search for additional victims.

When an intruder entered Tony Hula's bedroom armed with a knife, for example, Hula offered resistance. This intruder called to another, to bring a "burner;" and upon being faced with the pistol, Hula submitted. Considered in the light most favorable to the State, the evidence was sufficient for a rational factfinder to conclude beyond a reasonable doubt that the intruders, Vaughn included, took the victims with an intent to hold them to facilitate both the aggravated burglary of the house and the aggravated robbery of the individuals within it. See *State v. Richmond*, 258 Kan. 449, 453, 904 P.2d 974 (1995); *State v. Holloman*, 240 Kan. 589, 593-94, 731 P.2d 294 (1987).

In arguing against a taking, Vaughn cites *State v. Kemp*, 30 Kan. App. 2d 657, 46 P.3d 31, *rev. denied* 274 Kan. 1116 (2002). But in that case the victims were moved as a "matter of convenience." 30 Kan. App. 2d at 660. Another case Vaughn cites, *State v. Buggs*, 219 Kan. 203, 216, 547 P.2d 720 (1976), gave a similar example that "[t]he removal of a rape victim from room to room within a dwelling solely for the convenience and comfort of the rapist is not a kidnapping."

In contrast, when the facts show "something more than just to make [the crime] more convenient," *i.e.*, something that makes "the commission of the crime 'easier' as, for example, by lessening the risk of detection," then the facts establish facilitation. 219 Kan. at 215. Such was the case here. A rational factfinder could conclude beyond a reasonable doubt that Vaughn and the other intruders did not move the victims to the living room merely for the sake of convenience, but to make the commission of their crimes substantially easier.

5

In another argument, Vaughn contends the facilitation was only incidental: "It was an effort to get everybody in the house to one central location to facilitate the robbery. Such movement was incidental to the robbery and not sufficient to support the kidnapping charges." But facilitation may not be incidental:

> "In the light of our statute . . . we cannot agree that merely because a taking 'facilitates' another crime it must necessarily be 'merely incidental' to the other crime. Whether a taking substantially 'facilitates' another crime or whether it is 'merely incidental' are two different things. The same taking cannot be both." *Buggs*, 219 Kan. at 215.

For the reasons already discussed, the movement here facilitated the crimes and thus was not incidental.

*Was There Confinement?*

Next, assuming the evidence did not establish a taking, did the evidence establish confinement—another aspect of the kidnapping instructions provided to the jury? Importantly, under the instructions, the jury could convict Vaughn of kidnapping based on evidence of *either* a taking or confinement. But Vaughn waives or abandons this issue by failing to brief it. See *State v. Llamas*, 298 Kan. 246, 264, 311 P.3d 399 (2013). As a result, his claim lacks merit. See *Holloman*, 240 Kan. at 594 (holding that while evidence did not show a taking, it did show confinement by force or threat, thereby supporting kidnapping).

Despite Vaughn's failure to argue the confinement aspect to the kidnapping instructions, we are persuaded the evidence was also sufficient to establish confinement. Since the victims were gathered together in one room, they could be guarded by one intruder armed with a pistol. The accomplices were thus enabled to search the house armed with the second pistol, collect the valuables, retrieve the car, and expect to make their escape without detection by law enforcement authorities. See *Richmond*, 258 Kan.

6

at 453-54. The confinement of the victims, like the taking of the victims which preceded it, facilitated the commission of the crimes.

Upon our review of the trial evidence in the light most favorable to the prosecution, we hold there was sufficient evidence to convince a rational factfinder that Vaughn was guilty beyond a reasonable doubt of seven counts of kidnapping.

ADMISSION OF INCRIMINATING STATEMENTS MADE AT THE HOSPITAL

For his second issue on appeal, Vaughn contends the trial court erred by not suppressing several inculpatory statements he made at the hospital while recovering from his injuries.

Preliminarily, Vaughn does not renew his suppression arguments made in the district court based on state evidentiary law or the federal Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d (2012) *et seq*. As a result, these arguments are waived or abandoned. *Llamas*, 298 Kan. at 264. Instead, Vaughn reprises his constitutional arguments raised in the district court based on custodial interrogation and his right to privacy.

In considering whether incriminating statements should have been suppressed as evidence, we adhere to the following standard of review:

> "[A]n appellate court applies a dual standard when reviewing the trial court's decision on a suppression question. First, the factual underpinnings of the decision are reviewed under a substantial competent evidence standard. Next, the appellate court reviews the trial court's legal conclusion drawn from those facts de novo. An appellate court does not reweigh evidence, assess witness credibility, or resolve conflicting evidence. [Citation omitted.]" *State v. Gibson*, 299 Kan. 207, 215-16, 322 P.3d 389 (2014).

7

Later in the day, following Vaughn's arrest at the crime scene, Thomas G. Fatkin and Timothy Relph, detectives with the Wichita Police Department, went to Vaughn's hospital room. Detective Fatkin sat in a chair next to Vaughn's bed, but the room was small and filled with medical equipment so Detective Relph remained at the foot of the bed. Detective Relph testified that he heard little of the exchange between Vaughn and Detective Fatkin and that he asked no questions of Vaughn.

There was no evidence that the detectives provided Vaughn with a warning in accordance with *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Still, Vaughn provided some biographical information, although he was unwilling to say anything further to the detectives. Detective Fatkin testified that he gave Vaughn his business card:

> "Well, people change their mind sometimes, and I explained to him that I was going to be the case detective on the case, and that if he so chooses, that he can contact me. It has my phone number on it and my name and I wanted to make sure he knew who I was. And that's really the only reason. If he wanted to talk to me at a later time, he could call me."

Without further questioning, Vaughn then volunteered several statements:

- "'I stood at the front door. They said don't let anybody go outside.'"
- "'I didn't have nowhere [*sic*] to go.'"
- "'Somebody called me, said do you want to make a quick dollar.'"

Next, Vaughn reiterated that he did not wish to say anything further, and the detectives left.

The following day, Detective Relph visited Vaughn's room. The detective testified he was at the hospital to interview another defendant and his supervisor "wanted me to check and see if Mr. Vaughn was scheduled for any kind of dismissal and make sure that the paperwork was ready for him." The detective said he learned Vaughn might be released from the hospital later that day, so he finalized the paperwork and took it to the officer guarding Vaughn. Detective Relph testified:

> "I could tell Mr. Vaughn was awake, and as I was talking to . . . the officer, I was explaining that Mr. Vaughn and some other people had to be kept separate in the jail. And at that point I showed him the paperwork and Mr. Vaughn was sitting up in bed. He seemed to be kind of curious, so I just showed to him . . . the charges he was going to be booked for. And at that point I told him, I reminded him the day before Detective Fatkin had left a card and he could contact him if he had anything more to add to the case."

Detective Relph testified that Vaughn asked about Detective Fatkin and said, "[W]hat if I want . . . to talk to him now?" According to Detective Relph, "I told him Detective Fatkin was resting because he had spent most of the night traveling to Salina. He was interviewing a codefendant named Brad, and I did mention that Brad, incidentally, was *throwing everybody under the bus*." (Emphasis added.)

The detective said he told Vaughn, "I was also working the case." Vaughn asked, "[C]an I talk to you then?" Detective Relph said yes and gathered some paper from the officer to take notes. Before the detective could pose a question, however, Vaughn said, "'Shit, look at their houses. They got pounds of dope and they are saying I'm in charge?'" Vaughn then stated, "'Please look at them and then look at me and see who should be thrown under a bus.'"

The detective testified he decided to give Vaughn the *Miranda* warning, but before he finished, Vaughn interjected, "'Are we cool then? I don't want to say anything right

now.'" This stopped the detective from continuing with the *Miranda* warning, but Vaughn continued talking, making several incriminating statements:

- "'All I did was stand in the doorway.'"
- "'The police thought I had a gun, but that was a big knife case that they took off the wall.'"
- "'You show me a document where they throw me under the bus and I will tell you every fact.'"
- "'Listen, Brad, I trusted him until he took my shoes. They was [*sic*] the ones that run [*sic*] up on the house. They told me to stand next to the door. Then I ran out the back."
- "'You want to get technical, Brad had a baby 9. The other dude had a black and brown gun.'"
- "'I bet they didn't say that.'"

Prior to trial, Vaughn moved to suppress these statements because he alleged that he was subjected to custodial interrogation after invoking his right to remain silent. In denying the motion to suppress evidence, the district court found, however, that Vaughn's statements "were not the result of any questions directed to him by law enforcement." The district court specifically found Vaughn's statements to Detective Relph were "voluntary" and were not given under "custodial interrogation."

On appeal, Vaughn does not address any issues related to the giving of *Miranda* warnings. Instead, he contends both detectives violated his rights under the Fourth Amendment to the United States Constitution by interrogating him after he had invoked his right to silence. Vaughn argues Detective Fatkin conducted an interrogation when the detective "handed him his business card in case he 'changed his mind' about talking." With regard to Detective Relph, Vaughn argues he conducted an interrogation when he "approached Vaughn [and] stated that he was being 'thrown under the bus.'"

10

In response, the State contends Detective Fatkin did not interrogate Vaughn by handing him a business card, but the State does not directly deny that Detective Relph initiated an interrogation. The State maintains in the latter instance only that Vaughn was willing "to talk . . . before [Detective] Relph's comment was ever even made."

In evaluating the constitutional propriety of a custodial interrogation by law enforcement officers, we are guided by the following precedent:

> "The rules governing an accused's constitutional rights during a custodial interrogation are well established: 'The Fifth Amendment to the United States Constitution guarantees the right against self-incrimination, including the right to have a lawyer present during custodial interrogation and the right to remain silent.' *State v. Walker*, 276 Kan. 939, 944, 80 P.3d 1132 (2003) (citing *Miranda*, 384 U.S. at 479). Moreover, in Kansas, '[n]o person shall be a witness against himself [or herself].' Kan. Const. Bill of Rights, § 10. '[A] suspect's invocation of his or her right to remain silent must be scrupulously honored and cuts off further interrogation elicited by express questioning or its functional equivalent.' *State v. Scott*, 286 Kan. 54, 69-70, 183 P.3d 801 (2008) (citing *State v. Carty*, 231 Kan. 282, 286, 644 P.2d 407 [1982])." *State v. Aguirre*, 301 Kan. 950, 954, 349 P.3d 1245 (2015).

Vaughn does not allege he was expressly questioned, but he complains that he was subjected to the functional equivalent of express questioning after he invoked his right to remain silent. The functional equivalent of express questioning includes

> "'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.' *Rhode Island v. Innis*, 446 U.S. 291, 300-01, 64 L. Ed. 2d 297, 100 S. Ct. 1682 (1980); see *State v. Woolverton*, 284 Kan. 59, 70-71, 159 P.3d 985 (2007) (*Miranda* warnings required for all custodial interrogations). The test of whether the officers should know their words or actions are reasonably likely to elicit an incriminating response, so as to amount to the functional equivalent of interrogation, is an objective one. Even so, the officers' intent is not necessarily irrelevant. *Innis*, 446 U.S. at

11

301-02 n.7; see also *United States v. Cooper*, 19 F.3d 1154, 1162 (7th Cir.1994) ('Where an objective observer would believe that the encounter was reasonably likely to elicit an incriminating response from the defendant, the court will find that the encounter constituted the "functional equivalent" of interrogation.').'" *State v. Warledo*, 286 Kan. 927, 935-36, 190 P.3d 937 (2008).

We will first consider whether Detective Fatkin's handing of his business card to Vaughn was the functional equivalent of questioning.

At the outset, Vaughn does not cite a case where a law enforcement officer handing a business card to a suspect with an invitation to speak in the future was considered the functional equivalent of express questioning. Vaughn does cite *State v. Hebert*, 277 Kan. 61, 67, 82 P.3d 470 (2004), where an officer told a defendant:

> "'I've only heard one side of the story and, obviously, there's always two sides of a story here and I'd like in your words, your input and tell me what happened and explain in your words and coming from you. Would you like the opportunity to tell me your side of the story?'"

*Hebert* is distinguishable, however, because it featured an actual question—the officer asked the defendant if he would like to give information at that time. In the present case, Detective Fatkin offered Vaughn a chance to talk with him at some time in the future. Since Detective Fatkin was opening a channel for future communication with Vaughn rather than soliciting an answer from him at that time, Detective Fatkin's communication does not exhibit the qualities of the functional equivalent of express questioning.

We find support for the conclusion that Detective Fatkin's communication was not the functional equivalent of questioning in *United States v. Comosona*, 848 F.2d 1110, 1112-13 (10th Cir. 1988). In *Comosona*, the United States Court of Appeals for the Tenth

12

Circuit held a defendant was not interrogated when an agent handed him a business card and invited him "to call him collect if he wished to speak further about the incident." 848 F.2d at 1112. The federal court believed that "characterizing such a practice as 'interrogation' would unduly hamper law enforcement officials in the routine aspects of their criminal investigations." 848 F.2d at 1113. We agree. We do not find error in admitting statements that Vaughn volunteered after Detective Fatkin handed him his business card and mentioned that he could contact the officer at a later time if he wanted to speak to him.

Next, we consider whether Detective Relph's statement to Vaughn that a codefendant "was throwing everybody under the bus" was the functional equivalent of questioning.

As a general proposition, advising a defendant that he or she has been implicated by a codefendant (or another witness) can be the functional equivalent of express questioning. See *State v. Montes*, 136 Ariz. 491, 493-95, 667 P.2d 191 (1983); *Phillips v. State*, 285 Ga. 213, 216, 675 S.E.2d 1 (2009); 2 LaFave, Israel, King & Kerr, Criminal Procedure § 6.7(c), p. 781 n.111 (3d ed. 2007). But Vaughn's citation to *Hebert* is again distinguishable because, unlike the present facts, *Hebert* featured an actual question by an officer to a defendant.

Considering the facts of the present case, we are persuaded that Detective Relph engaged in the functional equivalent of express questioning. The detective spoke to Vaughn on a matter of interest—the criminal charges Vaughn would be facing—and reminded Vaughn that he could talk to Detective Fatkin. When Vaughn asked about Detective Fatkin, Detective Relph spontaneously volunteered that Vaughn's codefendant had implicated other intruders during his interview with Detective Fatkin. The detective testified to doing so incidentally, but in context there was a design to elicit a response.

13

Vaughn, therefore, was subjected to custodial interrogation after invoking his right to remain silent.

The State counters that Detective Relph made the statement only after Vaughn asked "what if I want to talk to him now," meaning Detective Fatkin. We could be persuaded by the State's argument if Vaughn had thereby waived his right to remain silent. See *State v. Mattox*, 280 Kan. 473, 481, 124 P.3d 6 (2005), *cert. denied* 547 U.S. 1197 (2006). But the State does not argue waiver and, as a consequence, abandons that point on appeal. See *State v. Boleyn*, 297 Kan. 610, 633, 303 P.3d 680 (2013).

Vaughn's question about talking to Detective Fatkin also does not meet the standard for waiver. A valid waiver occurs only when a defendant initiates further discussions with the police and knowingly and intelligently waives the previously asserted right. See *Mattox*, 280 Kan. at 481. Vaughn was asking about incidents of the custodial relationship, *i.e.*, how to speak with Detective Fatkin, rather than articulating a willingness and desire to discuss the investigation. See 280 Kan. at 481. We conclude that the admission of Vaughn's incriminating statements made immediately after Detective Relph's "throwing everybody under the bus" comment was error.

*Incriminating Statements Made to Medical Providers*

Vaughn also complains about the admission into evidence of several incriminating statements he made to medical providers which were overheard by law enforcement officers.

Stephen Schmitt, a Wichita police officer, guarded Vaughn at the hospital. Officer Schmitt heard Vaughn tell a medical provider:

14

- "'I never meant for anyone to get hurt. I just wanted the money and go.'"
- "'I was never going to shoot anybody. I was just holding the gun. The safety was on.'"
- "'The guy who shot me, shot me right, because it made me drop the gun. I tried to run, but just hit the ground.'"
- "'We were making money in a bad way.'"

Glenn Ludwig, a Wichita police officer, relieved Officer Schmitt. Officer Ludwig testified that Vaughn asked him: "'Did you guys catch the driver of the car?'" On appeal, Vaughn groups this statement with others he made to medical providers, but it is clear from the transcript that Vaughn asked the question directly to the officer.

Officer Ludwig also testified to statements that Vaughn made to medical providers. The officer said Vaughn told one: "I know that was stupid." The officer said that Vaughn responded to another's question by mentioning the "backyard," and that "he heard two pops and his arm went dead." Officer Ludwig also recounted what he heard from Vaughn:

"And then all of a sudden he just stated that there being kids in the house and he had the gun, he wasn't going to let anything happen to them. He said that the cops came and they ran out the back, heard two pops and he couldn't feel his arm."

Finally, Officer Ludwig testified Vaughn told a medical provider that "all he wanted to do was go get the weed and get out."

In the district court, Vaughn moved to suppress these statements on the basis that their admission at trial violated his constitutional right to privacy. The district court denied suppression reasoning that "it's hard for the Court to fathom the defendant had any realistic or constitutionally protected expectation of privacy. Everything he said was subject to being heard by a lot of people in that room, particularly the police officer."

15

On appeal, Vaughn argues for a "constitutional right to privacy as it relates to confidential medical information." Preliminarily, we first distinguish Vaughn's question to Officer Ludwig regarding the identity of the accomplice who drove from the crime scene. Since Vaughn does not challenge the admission of this statement with pertinent argument, he waives or abandons the challenge on appeal. See *State v. Tague*, 296 Kan. 993, 1001, 298 P.3d 273 (2013).

With regard to statements made to the medical providers and overheard by the officers, our first question is the nature of the state action. See 2 LaFave, Israel, King & Kerr, Criminal Procedure § 6.10(b), p. 872 ("state action is a prerequisite to application of constitutional protections"). Vaughn identifies the state action: "By placing a guard in his room and then admitting at trial the statements Vaughn made to his medical providers, the State effectively eliminated Vaughn's right to privacy."

Since Vaughn was in police custody at the hospital, the State did not violate his constitutional rights by placing officers in his room. See *State v. Wagner*, 39 Kan. App. 2d 279, 286, 179 P.3d 1149 (2008). As a general rule, because the officers had a right to be where they were, Vaughn's volunteered inculpatory statements made while in the officers' hearing were admissible at trial. See *United States v. Yamba*, 506 F.3d 251, 256-57 (3d Cir. 2007); *United States v. Ceballos*, 385 F.3d 1120, 1124 (7th Cir. 2004).

Under the circumstances, Vaughn must show a legitimate expectation of privacy in order to invoke constitutional protection. See *Aid for Women v. Foulston*, 441 F.3d 1101, 1116-17 (10th Cir. 2006). A defendant does not have a legitimate expectation of privacy in statements readily audible to law enforcement officers. See *Bassik v. Scully*, 588 F. Supp. 895, 902 (E.D.N.Y. 1984) (defendant made statements to his brother knowing detectives were in the room); *State v. Savage*, 575 So. 2d 478, 491-92 (La. App. 1991) (defendant spoke loudly in the jail with his mother). Vaughn even acknowledges that his privacy rights are not absolute and required a weighing of interests, such as the

16

State's compelling interest in prosecuting crimes. See *Alpha Med. Clinic v. Anderson*, 280 Kan. 903, 921, 128 P.3d 364 (2006).

Vaughn asserts that it was essential for him to communicate with medical personnel despite the continual presence of police officers in his hospital room. He claims the "alternative would have been . . . to refuse to communicate with his medical providers, putting his health at risk." But none of Vaughn's statements, other than about the loss of feeling in his arm, appear to have been related to his health, and that statement was not inculpatory. Even if Vaughn had constitutional privacy rights in his statements to medical providers, the challenged statements were unrelated to his medical care and treatment, and he does not show his inculpatory statements outweighed the State's interest in prosecuting the crimes.

Consistent with our analysis, Vaughn does not cite any authority supporting suppression on the ground of a constitutional right to privacy. Vaughn cites *A.L.A. v. West Valley City*, 26 F.3d 989 (10th Cir. 1994), which was a civil rights case against a city and several of its police officers for an officer's false statement to the plaintiff's family that the plaintiff had HIV. The issue in that case, however, was not suppression of evidence but whether the plaintiff showed an injury in fact. The only statement of law in *A.L.A.* which relates to the present case provides: "There is no dispute that confidential medical information is entitled to constitutional privacy protection." 26 F.3d at 990. This legal point related to the basis for the federal civil rights claim.

*A.L.A.* is clearly not on point. But even if the just-quoted statement of law did apply here, Vaughn assumes Officers Schmitt and Ludwig overheard confidential medical information. On the contrary, Vaughn's statements at the hospital generally bore on his guilt, not on his medical condition or treatment. The officers' overhearing of Vaughn's statements would, therefore, not trigger the same sort of constitutional

17

considerations. And assuming they did, the weighing of interests already discussed would tip towards admission as evidence at trial.

Next, Vaughn cites *State v. George*, 223 Kan. 507, 575 P.2d 511 (1978), a prosecution for driving under the influence of intoxicating liquor. In that case, our Supreme Court allowed testimony from officers who conducted and observed dexterity tests witnessed by a doctor because "it was not a confidential communication between patient and physician." 223 Kan. at 511. Our Supreme Court only excluded the doctor's own mental impressions formed after an entirely visual, nonverbal examination. See 223 Kan. at 511-13.

*George* did not relate to a constitutional right to privacy. *George* also concerned testimony by a medical provider, which was not at issue here. Finally, even if *George* applied to the present case, Vaughn's statements in the hospital were more like the dexterity tests observed by the officers in *George*, which were not confidential, than they were like the mental impressions of the doctor, which were confidential.

Having reviewed Vaughn's incriminating statements made to medical personnel and overheard by law enforcement officers, we are convinced that no constitutional privacy rights were violated by their admission in evidence. The district court did not err.

*Prejudice Due to the Erroneous Admission of Evidence at Trial*

Vaughn argues he was prejudiced by admission of his statements at the hospital because they "directly" contradicted his trial testimony. Vaughn maintains the jury credited his statements at the hospital rather than his trial testimony. Given Vaughn's constitutional arguments, the State must prove beyond a reasonable doubt that any error did not affect the outcome in light of the entire record. See *State v. Santos-Vega*, 299 Kan. 11, 24, 321 P.3d 1 (2014).

18

We have found error only in the admission of statements made by Vaughn after Detective Relph's "Brad, incidentally, was throwing everybody under the bus" statement.

Were these statements prejudicial? Vaughn referenced houses with pounds of dope and questioned whether, in comparison, he "'should be thrown under the bus'" rather than "'them.'" Interestingly, Vaughn's defense was that at the time of the incident he and his group were merely attempting to purchase marijuana from Tony Hula. Vaughn's remark was not necessarily incriminating with regard to the charged offenses, but it could be understood to support his defense.

For example, Vaughn also told a medical provider that he wanted to "'go get the weed and get out.'" Although on appeal Vaughn argues this statement was inadmissible, after Officer Ludwig testified to this statement at trial, Vaughn's counsel asked Officer Ludwig to repeat it during cross-examination. Vaughn then testified on his own behalf that the incident was a drug buy which had escalated into a dispute, not a burglary and robbery. Vaughn's counsel also argued the point in closing argument. Given these circumstances, we are not convinced that Vaughn's references to houses containing pounds of dope were prejudicial. On the contrary, these circumstances plausibly supported his defense.

Other inadmissible statements that Vaughn made placed him at the scene, standing by the doorway of the home, running out the back of the house, carrying a knife case, and acknowledging that two of the men in his group were armed with handguns. This information contained in Vaughn's statements was not especially prejudicial for two reasons. First, given Vaughn's defense and his testimony in support of that defense, the information which placed him at the scene and running out of the house was not necessarily incriminating. Second, all of the information Vaughn provided to Detective Relph was almost undisputed given the testimony of the victims, law enforcement

19

officers who apprehended Vaughn at the scene, and the other statements that Vaughn made at the hospital which we have determined were appropriately admitted in evidence.

Moreover, setting aside the inadmissible statements, the evidence of Vaughn's guilt was substantial. The several victims offered testimony that was both consistent among them and entirely in conflict with Vaughn's version of events. The same is true for officers who approached the house during the commission of the crimes. They testified to seeing intruders in the living room or at the front door, which supported the victims' testimony and contradicted Vaughn's account that he and the other intruders had entered the back door and remained in the kitchen while conducting the purported drug buy from Tony Hula.

Further supporting the victims' testimony was their dress and location when the police entered. Those who testified to being on the porch were fully dressed, and those who testified to being asleep were in their underwear, yet all were together in the living room. Tony Hula, for example, was in his underwear when the police entered, and he testified he would not have met with the intruders, as Vaughn had testified, without being fully dressed.

Considered in light of the entire record, the erroneous admission of statements Vaughn made at the hospital to Detective Relph did not affect the outcome of the trial beyond a reasonable doubt. The State's evidence was direct, extensive, and compelling.

KIDNAPPING JURY INSTRUCTION

Vaughn does not contend the kidnapping jury instruction, which followed the Pattern Instructions for Kansas, was erroneous. See PIK Crim. 4th 54.210. Instead, he argues the trial court should have added a statement of law from *State v. Buggs*, 219 Kan. 203, 216, 547 P.2d 720 (1976), to the approved PIK language relating to kidnapping.

In reviewing this issue, we apply a four-step analysis:

> "For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)." *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012).

With regard to the first step, Vaughn requested the additional language to the kidnapping instruction, so the issue was preserved, and neither party questions our jurisdiction.

Next, we consider the second step, and ask: Was the requested instruction legally appropriate? As already suggested, the issue is not whether the PIK language was legally appropriate. The issue is also not whether the *Buggs* language was legally appropriate. Rather, the issue is whether the instruction Vaughn actually requested, *i.e.*, the PIK language plus the *Buggs* language, was legally appropriate. See *State v. Williams*, 295 Kan. 506, 518, 286 P.3d 195 (2012) ("the district court errs if it refuses to give a requested instruction that is legally appropriate and factually supported by some evidence," citing *Plummer*, 295 Kan. at 162).

21

With the particular count and victim's name deleted, the kidnapping instructions advised the jury:

"[T]he defendant is charged with Kidnapping. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. The defendant took or confined [the victim] by force or threat.

"2. The defendant did so with the intent to hold [the victim] to facilitate the commission of any crime.

"3. This act occurred on or about the 13th day of April, 2012, in Sedgwick County, Kansas."

Vaughn, however, requested the addition of the following language:

"to be kidnapping the resulting movement or confinement
"(*a*) Must not be slight, inconsequential and merely incidental to the other crime;
"(*b*) *Must not be of the kind inherent in the nature of the other crime*; and
"(*c*) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection.
"For example: A standstill robbery on the street is not a kidnapping; the forced removal of the victim to a dark alley for robbery is. The removal of a rape victim from room to room within a dwelling solely for the convenience and comfort of the rapist is not a kidnapping; the removal from a public place to a place of seclusion is. The forced direction of a store clerk to cross the store to open a cash register is not a kidnapping; locking him in a cooler to facilitate escape is. The list is not meant to be exhaustive, and may be subject to some qualification when actual cases arise; it nevertheless is illustrative of our holding.
"*State v. Buggs*, 219 Kan. 203, 547 P.2d 720 (1976)."

Vaughn's requested additional language was a direct quote from *Buggs*, 219 Kan. at 216. After considering the matter, the trial judge advised Vaughn's counsel that while he was free to argue the *Buggs* language in closing argument, the text was not well suited

22

for a jury instruction. The trial judge reasoned: "I think it would be unduly burdensome, and while [a]ppellate decisions are accurate statements of the law, they aren't always couched in terms that are clear and concise and would follow the intent of PIK, to reduce legal terms into simple language that jurors can understand."

We agree with the trial court. In *State v. McKessor*, 246 Kan. 1, 11, 785 P.2d 1332 (1990), a defendant similarly argued a trial court erred by failing to give the PIK instruction with the additional *Buggs* language. Our Supreme Court did not find error: "In *State v. Nelson*, 223 Kan. 572, 573-74, 575 P.2d 547 (1978), this court approved the use of the pattern instruction under similar circumstances. The policy question for this court is whether our holding in *Nelson* should be overruled. This we decline to do." *McKessor*, 246 Kan. at 11.

We understand *McKessor* as support for a trial court's decision to choose plain, understandable language to inform the jury regarding the law rather than a more expansive, detailed, and complex exposition of the law. In this way, *McKessor* is clearly consonant with the purpose of the pattern instructions: "The pattern instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions." *State v. Pioletti*, 246 Kan. 49, 58, 785 P.2d 963 (1990). For this reason, it is well settled that district courts should generally follow the PIK language. See *State v. Cox*, 297 Kan. 648, 662, 304 P.3d 327 (2013); *State v. Torres*, 294 Kan. 135, 147, 273 P.3d 729 (2012).

With regard to the third step of analysis, the State concedes the *Buggs* language was factually appropriate. But for the reasons already stated, the district court did not err by providing the jury with the standard PIK instruction without the additional language from *Buggs*.

AGGRAVATED ROBBERY JURY INSTRUCTION

This instructional issue relates to Count 8, the aggravated robbery of Merritt. The trial court instructed the jury to decide whether Vaughn "knowingly took property from the presence of Patricia Merritt . . . by force or threat of bodily harm to Patricia Merritt" while "armed with a dangerous weapon." Vaughn's counsel, however, asked for an instruction on attempted aggravated robbery because the crime "was foiled by the law enforcement officers that arrived" and so was not "consummated to [its] conclusion."

The trial judge denied Vaughn's request:

"[O]nce the property is taken from the presence of another or from that person, the act of robbery is completed, despite the later interception or apprehension by police. And in fact, at least three individuals made it into the back yard. So I don't see the need to instruct on the attempted aggravated robbery of Patricia Merritt. The evidence is that once the property was taken, that crime is completed and the Court has no duty to instruct on attempted."

Employing the same standard of review as before with regard to reviewability, the parties agree that Vaughn raised this issue below. As to the second step, Vaughn argues the instruction was legally appropriate because an attempt is a lesser included offense of the charged crime. See *State v. Weber*, 297 Kan. 805, Syl. ¶ 4, 304 P.3d 1262 (2013). We agree. See *State v. Tolliver*, No. 111,684, 2015 WL 1636846, at *4 (Kan. App. 2015) (unpublished opinion) ("it is clear that giving an attempt instruction in this case was legally appropriate because attempted aggravated sexual battery is a lesser included offense of aggravated sexual battery").

24

The crux of the issue is the third step in the analysis, whether the attempt instruction was factually appropriate. Merritt testified that while she was in the basement calling 911, she heard someone running down the stairs. She ended the phone call and hid the phone. One of the intruders turned on a light, waking Ringer's infant son. Merritt picked up the boy and sat on a bed. The room in question was Merritt's bedroom, and the money included Ringer's tips earned from bartending. Ringer did not live at the residence, but he stayed with Merritt some nights.

Merritt testified the intruder "was just kind of glancing around the room and we had some money sitting on the computer desk. He picked that up." Ringer testified that he had placed $120 on the desk that night after arriving from work. Merritt testified that along with Ringer's tip money, "I had a couple dollars sitting there . . . and I think there was a roll of quarters sitting there too." There was evidence the intruders took money from elsewhere in the house, and police recovered $164 in small bills and a roll of quarters from one intruder's clothing and from the backyard where the intruders fell. In closing arguments the State identified the bills and the roll of quarters as property taken from the presence of Merritt.

"Even if an instruction is legally appropriate, the instruction is only required when '"there is some evidence which would reasonably justify a conviction of [the lesser included offense.]"'" *State v. Brown*, 300 Kan. 565, 585, 331 P.3d 797 (2014) (quoting *Plummer*, 295 Kan. at 161 [quoting K.S.A. 22-3414(3)])." The evidence is viewed in the light most favorable to the defendant. *Brown*, 300 Kan. at 585-86. Considered in the light most favorable to Vaughn, the evidence did not support an attempt instruction.

"The crime of robbery is complete when the individual takes possession of the property, because asportation is no longer required to complete the crime." *State v. Edwards*, 299 Kan. 1008, 1015, 327 P.3d 469 (2014). The intruders in the present case took possession of the money because they exercised complete, independent, and

25

absolute control over it, adverse to the rights of Merritt. See *Brown*, 300 Kan. at 557. Vaughn points out that he and the other intruders were still gathering property when the police arrived, but they had finished gathering the property in question here. Vaughn points out they were unable to leave the scene with the property because the police intervened, but the intruders had left the presence of Merritt, the room she was in, and the house itself. Merritt also did not resist, which would have prolonged the robbery, as in the case Vaughn cites. See *State v. Randle*, 32 Kan. App. 2d 291, 293, 81 P.3d 1254, *rev. denied* 277 Kan. 927 (2004). We are persuaded that the trial court properly refused to give the attempted aggravated robbery instruction.

OVERBREADTH OF AGGRAVATED ROBBERY AND ATTEMPTED AGGRAVATED ROBBERY INSTRUCTIONS

The next instructional issue raised by Vaughn relates to Count 8, the aggravated robbery of Merritt, and Count 9, the attempted aggravated robbery against unspecified victim(s). Vaughn contends both jury instructions were broader than the crimes as alleged in the charging document. The State denies the error but also argues in the alternative that if there was error it was harmless.

In the charging document, Count 8 described the property Vaughn took as:  "to-wit:  approximate[ly] $108.00 in cash." The trial court's proposed instruction relating to this count dropped the to-wit clause and identified the property Vaughn took simply as "property." Vaughn objected at the instructions conference and asked the trial court to reinsert the to-wit clause.

In the charging document, Count 9 described the overt act Vaughn committed as: "to-wit:  put the items in a trash bag in the living room." The trial court's proposed instruction dropped the to-wit clause and identified the overt act simply as "overt act."

26

Vaughn again objected and asked the trial court to follow the language in the charging document.

The trial judge denied both requests:

"Well, number 1, the law just requires that property be taken from the person or the presence of the person by force or threat. With regard to the $108 and then the . . . attempted aggravated robbery, there[ were] seven people . . . . There [were] numerous items of electronics. There was a TV removed from one bedroom out to the game table in the basement. Those are the overt acts . . . . [A]gain, the instructions are to conform to the evidence that the jury has heard. While there is a charging document that is mere allegations, what has been presented to the jury and what they can consider as evidence is that the property of any of these seven individuals was taken by force or threat and armed with a dangerous weapon.

"I don't think the State is limited to $108. There [was] evidence that cash was taken. There was evidence that the glass jar of marijuana was taken. The attempted robbery is what the defense was put on notice in the Information was the assembly of items in the living room. There [was] the TV in the basement, but I think the defendant is aware of what the overt acts are and the State is allowed to argue in a general sense to conform to their theory . . . to the evidence presented to the jury."

On appeal, Vaughn argues that since the jury "instructions were broader than the charge[s] actually brought against" him, his "due process rights were violated." Vaughn identifies the due process violation as "[a] conviction that rests on something that has not been charged," citing in support *Cole v. Arkansas*, 333 U.S. 196, 197-02, 68 S. Ct. 514, 92 L. Ed. 644 (1948). Our standard of review is the same as in the prior two issues.

With regard to whether this issue is reviewable, the parties agree that Vaughn raised the issue in the district court. Next, we consider whether the instructions were legally appropriate.

27

The charging document identified the elements in question—property and an overt act—and specified the facts which satisfied those elements—$108 in cash and putting items in trash bags in the living room, respectively. Removing the factual specifications in the instructions broadened the charges by leaving open the possibility that other facts could satisfy the elements. As Vaughn complains, the "instructions . . . allowed for a conviction based on other evidence." Vaughn's argument is buttressed by the trial court's ruling that because other facts at trial would support the elements, the instructions should be broader than the charging document.

Before discussing the cases Vaughn cites, it is important to set out the legal framework:

"A jury instruction on the elements of a crime that is broader than the complaint charging the crime is erroneous. The reason for this is because the charging instrument sets out the specific offense alleged to inform the defendant of the nature of the accusation, to permit the development of a defense to meet that accusation, and to protect against conviction based on facts not contemplated in the accusation. Accordingly, the State is bound by the wording of its charging document, and the prosecution and district court must use caution in conforming the jury instructions to the charges."

"Generally, if a jury instruction on the elements of a crime adds alternate statutory elements that were not contained within the language of the complaint or information charging the defendant with the crime, the instruction is overly broad and, thus, erroneous." *State v. McClelland*, 301 Kan. 815, Syl. ¶¶ 4-5, 347 P.3d 211 (2015).

Since Vaughn is arguing a due process violation under the federal Constitution, we rely on a federal case with similar facts. In *United States v. D'Amelio*, 683 F.3d 412, 414 (2d Cir. 2012), a defendant was charged with using interstate commerce, "to wit . . . a computer and the Internet," while attempting to persuade, induce, or entice a minor to

28

engage in sexual activity. The government later produced evidence that the defendant had also used a telephone.

The trial court instructed the jury:

"'The third element the government must prove beyond a reasonable doubt is that the defendant used a facility or means of interstate commerce in order to attempt to persuade, induce, or entice the person he believed to be a minor to engage in sexual activity. Both the telephone and the internet qualify as facilities or means of interstate commerce. Therefore, you must determine whether the government has proven beyond a reasonable doubt that a communication that constitutes an attempt to persuade, induce, or entice a person to commit a sexual act, was actually transmitted by means of a telephone, or the internet, or both.'" 683 F.3d at 415.

On appeal of the instruction, the United States Court of Appeals for the Second Circuit noted the result would depend "on whether the circumstances here demonstrate a constructive amendment of the indictment or a mere variance in proof." 683 F.3d at 416.

"To prevail on a constructive amendment claim, a defendant must demonstrate that 'the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify *essential elements* of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment.' *United States v. Mollica*, 849 F.2d 723, 729 (2d Cir. 1988) (internal quotation marks omitted) (emphasis added). In *United States v. Resendiz-Ponce*, 549 U.S. 102, 127 S. Ct. 782, 166 L. Ed. 2d 591 (2007), the Supreme Court restated the 'two constitutional requirements for an indictment: "first, [that it] contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, [that it] enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."' *Id.* at 108, 127 S. Ct. 782

29

(quoting *Hamling v. United States*, 418 U.S. 87, 117, 94 S. Ct. 2887, 41 L. Ed. 2d 590 (1974) (alteration in original)). . . .

"By contrast, '[a] variance occurs when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment.' *United States v. Salmonese*, 352 F.3d 608, 621 (2d Cir. 2003) (internal quotation marks omitted)." 683 F.3d at 416-17.

An authority on federal law summarizes the importance of the constructive amendment/variance distinction as follows:

"If the matter is considered merely a variance, it is reversible error only if it affected the defendant's substantial rights; in other words, the defendant must prove prejudice to get relief. The defendant would have to show, for example, that his substantial rights were affected because he could not have anticipated from the indictment what evidence would be presented at trial or that the conviction would not bar a subsequent prosecution. Although courts sometimes find variances to be prejudicial and therefore reverse the conviction, more often courts conclude that the variance does not prejudice the defendant and do not find reversible error.

"In contrast, a constructive amendment involves a difference between the pleading and proof so great that it essentially changes the charge. A constructive amendment requires relief without proof of prejudice when the objection is timely raised." 3 Wright & Welling, Federal Practice and Procedure: Criminal 4th § 516, pp. 46-49 (2011).

We note that our Supreme Court has recognized the possibility of "constructive amendment through the jury instruction." *State v. Tapia*, 295 Kan. 978, 993, 287 P.3d 879 (2012).

Turning now to the arguments presented on appeal, Vaughn contends the instructions for Counts 8 and 9 provided "multiple avenues" for conviction. He cites *State v. Trautloff*, 289 Kan. 793, 801, 217 P.3d 15 (2009), where the charging document alleged a defendant promoted the performance of sexually explicit conduct by a child

30

when he "'displayed'" a picture of the child. Later, the jury was instructed to decide whether the defendant promoted the performance by "'procuring, selling, providing, lending, mailing, delivering, transferring, transmitting, distributing, circulating, disseminating, presenting, producing, directing, manufacturing, issuing, publishing, displaying, exhibiting or advertising.'" 289 Kan. at 801-02.

Our Supreme Court reversed:

"The broad instruction allowed the jury to convict Trautloff of displaying *or* procuring *or* producing a photograph that included sexually explicit conduct by a child under 14 years of age. It did not compel the jury to find that Trautloff displayed a picture, as alleged in the complaint. As previously described, the evidence of 'procuring' or 'producing' a photograph was direct and overwhelming, while the evidence that Trautloff 'displayed' a photograph or video was minimal and circumstantial. Although Trautloff did not object to the instruction at trial, the instruction was clearly erroneous because we cannot be confident that the jury convicted him only on the basis of the single alternative theory charged and instructed upon. There exists a real possibility that the jury would have rendered a different verdict if the district court had instructed only as to displaying." 289 Kan. at 803.

The jury instruction in Trautloff had "followed the broad language of the statute." 289 Kan. at 801. Here, in contrast, the statutes provided only one way of satisfying the element in question. See K.S.A. 2015 Supp. 21-5420(a) ("taking property"); K.S.A. 2015 Supp. 21-5301(a) ("any overt act"). The "multiple avenues" Vaughn complains of in the present case were, at most, different facts which could support the element.

Thus, the present case is more like *D'Amelio* than *Trautloff*, and the facts in *D'Amelio* showed only a variance, not a constructive amendment:

"The government's proof at trial did not modify an 'essential element' of the alleged crime. The essential element at issue is D'Amelio's use of a 'facility or means of

31

interstate . . . commerce,' 18 U.S.C. § 2422(b), not the particular means that were used. Neither the indictment nor proof at trial showed that D'Amelio committed this crime by means of, for example, use of force, which would have modified an 'essential element' of the crime. Whether D'Amelio used the Internet or a telephone makes no difference under the relevant statute." 683 F.3d at 422.

The Second Circuit ultimately held that "D'Amelio received constitutional notice." 683 F.3d at 423. We also think Vaughn received constitutional notice. At most the instructions here included variances with the charges, not constructive amendments of the charges.

Next, Vaughn complains about the instruction relating to Count 8—that the evidence of the cash stolen from Merritt's presence "does not add up to $108." Of course, the amount listed in the charging document was approximately $108, and the amount taken from Merritt's presence was $132 ($120 in Ringer's tips, $2 belonging to Merritt, and the roll of quarters). The amount of money shown at trial that was taken and the amount in the charging document alleged to have been taken was comparatively similar in value. We find no error.

Vaughn also asserts in passing that "there was evidence of other items taken." That is true, but there was no evidence of other items taken from Merritt's presence. We see no variance on this aspect of the proof.

With regard to the attempted aggravated robbery instruction, Vaughn also complains of a variance between this instruction and the evidence at trial relating to the overt act in support of the crime alleged in Count 9 of the charging document. In particular, Vaughn argues the trial evidence established overt acts other than the one charged—putting items in trash bags in the living room.

Recently, our Supreme Court explained Kansas law regarding overt acts:

32

"Kansas law does not provide definitive rules as to what constitutes an overt act toward attempting a crime. The overt act necessarily must extend beyond mere preparations made by the accused and must approach sufficiently near to the consummation of the offense to stand either as the first or subsequent step in a direct movement toward the completed offense." *State v. Ortega*, 300 Kan. 761, Syl. ¶ 1, 335 P.3d 93 (2014).

Entering the house with pistols drawn, centralizing the victims in the living room, and searching the house for valuables were all overt acts towards the commission of aggravated robbery. In *State v. Calvin*, 279 Kan. 193, 200, 105 P.3d 710 (2005), for example, our Supreme Court found an overt act towards robbery when "the defendant gained access to the victim's home with the intent of getting the door open for one of the codefendant's so he could rob the victim." Once the defendant had the door open, the codefendant pointed a gun at the victim. In the present case, as well, the intruders committed other overt acts in addition to putting items in trash bags.

It is apparent that, given the range of overt acts which took place, the jury instruction on Count 9 was broader than the charging document. Vaughn's request that the instruction conform to the charging document was supported by the evidence. We thus find a variance between the instruction and the charging document in this instance.

Was this error reversible or harmless? Vaughn argues that since he was subjected to "conviction based on a crime never charged," it "is irrelevant whether there was evidence to support the overbroad instructions." But Vaughn incorrectly assumes the instructions constructively amended the charging document. On the contrary, the error here did not go beyond a variance, and so the error is only reversible if it prejudiced Vaughn's substantial rights. See 3 Wright & Welling, Federal Practice and Procedure: Criminal 4th § 516, p. 46; accord K.S.A. 2015 Supp. 60-261.

33

"The law that a verdict is invalid if the proof and/or instructions are too different from the indictment is constitutional." 3 Wright & Welling, Federal Practice and Procedure: Criminal 4th § 516, p. 44. We therefore apply the constitutional harmless error standard: "[T]he error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error . . . did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict." *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

The State correctly argues that neither Vaughn nor the jury could have been confused by the variance. The variance regarding the overt act did not rise to the level of reversible error. The evidence of other possible overt acts was integral to the crimes charged and could not have constituted surprise at trial. The State also relied in its closing argument on the overt act it had earlier pled:

> "Attempted aggravated robbery. Number 1, the defendant performed an overt act toward the commission of aggravated robbery. An overt act must extend beyond mere preparation and be a first or subsequent step, a direct movement towards the completed offense. This is when we are talking about all of the items being bagged up in the living room. They are not just planning, okay, they are going to take this stuff.
> . . . .
> "No question why they are there. Their actions show that. They are there to commit aggravated robbery. The items are bagged up."

Considering the record as a whole, there is no reasonable possibility any variance between Count 9 of the charging document and the jury instruction contributed to the verdict. The State met its burden to show any error was harmless beyond a reasonable doubt.

Affirmed.